# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| IMPINJ, INC., | § | |
| Plaintiff/ | § | |
| Counterclaim Defendant, | § | |
| | § | |
| v. | § | Case No. 6:21-cv-00530-ADA |
| | § | |
| NXP USA, INC., | § | **FILED UNDER SEAL** |
| Defendant/ | § | |
| Counterclaim Plaintiff, | § | |
| | § | |
| NXP SEMICONDUCTORS NETHERLANDS | § | |
| B.V. | § | |
| | § | |
| Defendant. | § | |

## NXP'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................. 1

LEGAL STANDARD ............................................................................................................ 2

MOTION #1:  SUMMARY JUDGMENT OF NON-INFRINGEMENT SHOULD BE
GRANTED AS TO THE FOREIGN SALES ..................................................................... 2

    BACKGROUND ............................................................................................................ 3

    ARGUMENT ................................................................................................................. 6

        A.    Impinj's Theory Fails Under the Presumption Against
Extraterritoriality .................................................................................. 6

        B.    Impinj Cannot Prove Indirect Infringement for the Foreign Sales .......... 11

MOTION #2:  SUMMARY JUDGMENT SHOULD BE GRANTED FOR THE '835
AND '227 PATENTS BECAUSE THEIR ASSERTED CLAIMS ARE
NECESSARY TO PRACTICE THE GEN2 STANDARD ............................................. 19

    BACKGROUND .......................................................................................................... 19

    ARGUMENT ............................................................................................................... 20

        A.    Impinj Identified No Non-Infringing Alternatives for the Asserted
Claims of the '835 and '227 Patents ....................................................... 22

        B.    Under Impinj's Infringement Assertions, the Products Accused of
Infringing the Asserted Claims of the '835 and '227 Patents
Implement Gen2 ....................................................................................... 23

MOTION #3:  SUMMARY JUDGMENT OF NON-INFRINGEMENT SHOULD BE
GRANTED FOR THE '734 PATENT BECAUSE IMPINJ IS LEGALLY
BARRED FROM ASSERTING THE DOCTRINE OF EQUIVALENTS, ITS
ONLY THEORY ............................................................................................................... 32

    BACKGROUND .......................................................................................................... 33

    ARGUMENT ............................................................................................................... 33

MOTION #4:  SUMMARY JUDGMENT OF NON-INFRINGEMENT SHOULD BE
GRANTED FOR FIVE PATENTS BECAUSE IMPINJ CANNOT SHOW THAT
THE ACCUSED PRODUCTS MEET FUNDAMENTAL LIMITATIONS ................. 36

    BACKGROUND .......................................................................................................... 37

    ARGUMENT ............................................................................................................... 37

        A.    There Cannot be Infringement of the '198 Patent Because the
Accused Products Do Not Meet the Claimed "Processing Block" .......... 37

        B.    There Cannot be Infringement of the '251, '240, '468, or '835
Patents Because the Accused Products Do Not Contain a
"Transponder" or "RFID Tag" ................................................................ 40

# TABLE OF CONTENTS

**Page**

    C.    There Cannot be Infringement of Claims 1, 52, and 61 of the '835
    Patent Because the Accused Products Do Not Contain a
    "Processor" ............................................................................................. 48

CONCLUSION ............................................................................................................ 50

## TABLE OF AUTHORITIES

Page

CASES

*Applicance Computing III, Inc. v. Redfin Corp.*,
  No. 6:20-CV-00376-ADA, 2022 WL 2101693 (W.D. Tex. May 2, 2022) ...........................41

*Bio-Rad Labs., Inc. v. 10X Genomics Inc.*,
  967 F.3d 1353 (Fed. Cir. 2020) ............................................................................46

*Cal. Beach Co. v. Exqline, Inc.*,
  No. C 20-01994 WHA, 2020 WL 6544457 (N.D. Cal. Nov. 7, 2020) .................................16

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
  289 F.3d 801 (Fed. Cir. 2002)...........................................................................42, 47

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).............................................................................................2

*Clear Imaging Research, LLC v. Samsung Elecs. Co.*,
  No. 2:19-cv-00326-JRG, 2020 WL 6384731 (E.D. Tex. Oct. 30, 2020) ...............................49

*Clearmeadow Invs., LLC v. United States*,
  87 Fed. Cl. 509 (2009) ........................................................................................22

*CSP Techs., Inc. v. Sud-Chemie AG*,
  643 F. App'x 953 (Fed. Cir. 2016).........................................................................34

*Deepsouth Packing Co. v. Laitram Corp.*,
  406 U.S. 518 (1972)..............................................................................................8

*DSU Med. Corp. v. JMS Co.*,
  471 F.3d 1293 (Fed. Cir. 2006)..............................................................................16

*Duffy v. Leading Edge Prods., Inc.*,
  44 F.3d 308 (5th Cir. 1995) ...................................................................................2

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
  363 F.3d 1263 (Fed. Cir. 2004)...............................................................................16

*Enplas Display Device Corp. v. Seoul Semiconductor Co.*,
  909 F.3d 398 (Fed. Cir. 2018)..................................................................................9

*epicRealm, Licensing, LLC v. Autoflex Leasing, Inc.*,
  492 F. Supp. 2d 608 (E.D. Tex. 2007) .................................................................17, 18

iii

## TABLE OF AUTHORITIES
### (CONTINUED)

Page

*ePlus, Inc. v. Lawson Software, Inc.*,
    789 F.3d 1349 (Fed. Cir. 2015) ............................................................9

*Glob.-Tech Appliances, Inc. v. SEB S.A.*,
    563 U.S. 754 (2011)...........................................................................16

*HTC Corp. v. Telefonaktiebolaget LM Ericsson*,
    12 F.4th 476 (5th Cir. 2021) .............................................................22

*In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*,
    681 F.3d 1323 (Fed. Cir. 2012).........................................................19

*In re Fought*,
    941 F.3d 1175 (Fed. Cir. 2019).....................................................43, 46

*Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*,
    285 F.3d 1046 (Fed. Cir. 2002) (en banc).........................................33

*Johnston v. IVAC Corp.*,
    885 F.2d 1574 (Fed. Cir. 1989).........................................................50

*Jones v. United States*,
    936 F.3d 318 (5th Cir. 2019) .............................................................15

*King Pharm., Inc. v. Eon Labs., Inc.*,
    616 F.3d 1267 (Fed. Cir. 2010) .........................................................22

*Kiobel v. Royal Dutch Petroleum Co.*,
    569 U.S. 108 (2013)..............................................................................7

*Largan Precision Co. v. Genius Elec. Optical Co.*,
    646 F. App'x 946 (Fed. Cir. 2016) ...................................11, 12, 14, 15

*M2M Sols. LLC v. Motorola Sols., Inc.*,
    No. CV 12-33-RGA, 2016 WL 70814 (D. Del. Jan. 6, 2016) ................16

*Manville Sales Corp. v. Paramount Systems, Inc.*,
    917 F.2d 544 (Fed. Cir. 1990)...........................................................16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)..............................................................................2

## TABLE OF AUTHORITIES
## (CONTINUED)

**Page**

*Merial Ltd. v. Cipla Ltd.*,
    681 F.3d 1283 (Fed. Cir. 2012)...................................................................................9

*Microsoft Corp. v. AT&T Corp.*,
    550 U.S. 437 (2007)......................................................................................................7, 8

*Nichia Corp. v. Seoul Semiconductor Co.*,
    No. CV–06–0162 MMC, 2007 WL 2428040 (N.D. Cal. Aug. 22, 2007)...............17

*Nomadix, Inc. v. Hospitality Core Servs. LLC*,
    No. CV 14-08256 DDP, 2016 WL 344461 (C.D. Cal. Jan. 27, 2016)....................49

*Parkervision, Inc v. LG Elecs., Inc.*,
    No. 6:21-CV-00520-ADA, 2022 WL 2240465 (W.D. Tex. June 21, 2022)............42, 46

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)................................................................................46

*Phillips Petroleum Co. v. Huntsman Polymers Corp.*,
    157 F.3d 866 (Fed. Cir. 1998)..................................................................................44

*PI Advanced Materials Co. v. Kaneka Corp.*,
    851 F. App'x 178 (Fed. Cir. 2021).................................................................11, 12, 14, 15

*Poly-Am., L.P. v. GSE Lining Tech., Inc.*,
    383 F.3d 1303 (Fed. Cir. 2004)................................................................................43

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
    711 F.3d 1348 (Fed. Cir. 2013)......................................................................11, 13, 15

*PSC Comput. Prods., Inc. v. Foxconn Int'l, Inc.*,
    355 F.3d 1353 (Fed. Cir. 2004)................................................................................34

*Pulse Elecs., Inc. v. U.D. Elec. Corp.*,
    No. 3:18-cv-00373-BEN-MSB, 2021 WL 981123 (S.D. Cal. Mar. 16, 2021)........17

*Radar Indus., Inc. v. Cleveland Die & Mfg. Co.*,
    424 F. App'x 931 (Fed. Cir. 2011) ..........................................................................21

*RJR Nabisco, Inc. v. European Community*,
    579 U.S. 325 (2016)...............................................................................................7, 8, 9

# TABLE OF AUTHORITIES
## (CONTINUED)

**Page**

*Southwall Techs., Inc. v. Cardinal IG Co.*,
54 F.3d 1570 (Fed. Cir. 1995) ...................................................................45

*Swissdigital USA Co. v. Wenger S.A.*,
No. 6:21-cv-00453-ADA-DTG, 2022 WL 3567348 (W.D. Tex. Aug. 18,
2022) ........................................................................................................50

*SynQor, Inc. v. Artesyn Techs., Inc.*,
No. 2:11-CV-444, 2013 WL 12080731 (E.D. Tex. July 19, 2013), *adopted*,
2013 WL 12085171 (E.D. Tex. July 29, 2013) .......................................17

*Tolan v. Cotton*,
572 U.S. 650 (2014).....................................................................................2

*Toro Co. v. White Consolidated Indus., Inc.*,
383 F.3d 1326 (Fed. Cir. 2004)..................................................................34

*United States v. Lawrence*,
276 F.3d 193 (5th Cir. 2001) .....................................................................15

*Vita- Mix Corp. v. Basic Holding, Inc.*,
581 F.3d 1317 (Fed. Cir. 2009)..................................................................16

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
520 U.S. 17 (1997)......................................................................................34

*WesternGeco LLC v. ION Geophysical Corp.*,
138 S. Ct. 2129 (2018)..................................................................................8

*WSOU Invs. LLC v. Oneplus Tech. (Shenzhen) Co.*,
No. W-20-CV-00952-ADA, 2022 WL 3500120 (W.D. Tex. May 24, 2022) ........................49

*Zelinski v. Brunswick Corp.*,
185 F.3d 1311 (Fed. Cir. 1999)..................................................................44

## STATUTES

35 U.S.C. § 271(b) ................................................................................. passim

35 U.S.C. § 271(c) ................................................................................. passim

35 U.S.C. § 271(f) .........................................................................................8

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**Page**

35 U.S.C. § 271(g) .................................................................................................9, 10

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(a) ......................................................................................................2

**TABLE OF EXHIBITS**

| Exhibit Number | Exhibit Description |
|---|---|
| 1 | ████████████████████████████████ |
| 2 | ████████████████████████████████ |
| 3 | Expert Report of Lauren R. Kindler, dated February 21, 2023 |
| 4 | Excerpts of the transcript of the 30(b)(6) deposition of Impinj's Chief Revenue Officer, Jeff J. Dossett, on behalf of Impinj, taken on April 25, 2022 |
| 5 | Impinj presentation titled "Q217 MONZA SUMMIT," dated April 3, 2017 |
| 6 | Impinj's Notice of Service of Subpoena Upon Non-Party Avery Dennison Corp., dated November 23, 2022 |
| 7 | Impinj's Subpoena to Testify at a Deposition in a Civil Action to Avery Dennison, dated January 19, 2023 |
| 8 | Impinj's Notice of Service of Subpoena Upon Non-Party SML Group Limited, served on November 23, 2022 |
| 9 | Impinj's Subpoena to Testify at a Deposition in a Civil Action to SML Group, dated January 19, 2023 |
| 10 | Impinj's Notice of Service of Subpoena Upon Non-Party Checkpoint Systems, Inc., served on November 25, 2022 |
| 11 | Impinj's Subpoena to Testify at a Deposition in a Civil Action to Checkpoint Systems, dated January 19, 2023 |
| 12 | ████████████████████████████████ |
| 13 | ████████████████████████████████ |
| 14 | Avery Dennison's Objections and Responses to the Avery Dennison Subpoena, dated December 7, 2022 |
| 15 | Impinj's Supplemental Responses to NXP USA, Inc.'s Fifth Set of Interrogatories (Nos. 9-20), served on February 3, 2023 |
| 16 | ████████████████████████████████ |

**TABLE OF EXHIBITS**
**(CONTINUED)**

| Exhibit Number | Exhibit Description |
|---|---|
| 17 | Excerpts of the transcript of the deposition of Lauren Kindler, taken on September 13, 2022 |
| 18 | Excerpts of the transcript of the 30(b)(6) deposition of NXP Austria's Senior Director of RAIN RFID Solutions, Ralf Kodritsch, on behalf of NXP USA, Inc., taken on May 10, 2022 |
| 19 | Expert Report of Lauren R. Kindler, dated July 1, 2022 |
| 20 | Opening Expert Report of Carl Sechen Ph.D. Concerning Infringement of U.S. Patent Nos. 7,116,240; 7,215,251; 7,246,751; 7,388,468; 7,472,835; and 8,665,074, dated February 21, 2023 |
| 21 | Opening Expert Report of Daniel W. Engels Ph.D. Regarding Invalidity of Asserted Claims of U.S. Patent Nos. 7,246,751; 8,665,074; 7,472,835; 7,733,227; and 10,776,198, dated February 21, 2023 |
| 22 | |
| 23 | EPCglobal Intellectual Property Policy, Working Group Declaration, Rev. 12/15/2003 A, , IMPINJ_NXP_WDTEX_00017035–041 |
| 24 | Impinj's Responses to NXP USA, Inc.'s First Set of Requests for Admission (Nos. 1–34), dated December 22, 2022 |
| 25 | Excerpts of the transcript of the 30(b)(6) deposition of Christopher Diorio Ph.D., on behalf of Impinj, taken on January 30, 2023 |
| 26 | Excerpts of the transcript of the 30(b)(6) deposition of Paul Franzon, Ph.D., taken on April 4, 2023 |
| 27 | Response Expert Report of Paul Franzon, Ph.D. Concerning Validity of U.S. Patent Nos. 7,733,227; 10,776,198; and 10,929,734, dated March 20, 2023 |
| 28 | EPCglobal EPC™ Radio-Frequency Identity Protocols Class-1 Generation-2 UHF RFID Protocol for Communications at 860 MHz – 960 MHz, Version 1.1.0, IMPINJ_NXP_WDTEX_00017856 |
| 29 | Rebuttal Expert Report of Carl Sechen Ph.D. Concerning Validity of U.S. Patent Nos. 7,116,240; 7,215,251; 7,246,751; 7,388,468; 7,472,835; and 8,665,074, dated March 20, 2023 |

**TABLE OF EXHIBITS**
**(CONTINUED)**

| Exhibit Number | Exhibit Description |
|---|---|
| 30 | U.S. Patent No. 7,733,227, "RFID Tags Circuits And Methods For Sensing Own Power to Predetermine Feasibility Of Requested Action," IMPINJ_NXP_WDTEX_00002583–2616 |
| 31 | Letter from Impinj's counsel Ramsey M. Al-Salam, "Impinj Patents and NXP," dated October 6, 2017, NXP-IMP-NDCAL-00209515–542 |
| 32 | Excerpts of the transcript of the deposition of Carl Sechen, Ph.D., taken on April 7, 2023 |
| 33 | Exhibit 3 to Engels Opening Report, "'835 Patent Grounds" |
| 34 | Declaration of Ronald Oliver, served by Impinj on February 21, 2023 |
| 35 | Exhibit 6 to Engels Opening Report, "'227 Patent Grounds" |
| 36 | Excerpts of the transcript of the deposition of Paul Franzon, Ph.D., taken on April 5, 2023 |
| 37 | Excerpts of the transcript of the 30(b)(6) deposition of Franz Amtmann, on behalf of NXP, taken on January 19, 2023 |
| 38 | Excerpts of the transcript of the deposition of John Hyde, taken on January 24, 2023 |
| 39 | SL3S1204 UCODE 7 Product Data Sheet, Rev. 4.0 – 5 March 2019, IMPINJ_NXP_0001894–1933 |
| 40 | SL3S1205_15 UCODE 8/8m Product Data Sheet, Rev. 3.2 – 19 November 2018, IMPINJ_NXP_0001934–1969 |
| 41 | Opening Expert Report of Paul Franzon, Ph.D. Concerning Infringement of U.S. Patent Nos. 7,733,227; 10,776,198; and 10,929,734, dated February 21, 2023 |
| 42 | Excerpts of the transcript of the deposition of Carl Sechen, Ph.D., taken on April 6, 2023 |
| 43 | Excerpts of the transcript of the 30(b)(6) deposition of Ronald A. Oliver, on behalf of Impinj, taken on April 20, 2022 |
| 44 | Excerpts of the transcript of the 30 (b)(6) deposition of Christopher Diorio Ph.D., on behalf of Impinj, taken on April 13, 2022 |
| 45 | Impinj's Final Infringement Contentions, dated March 29, 2022 |
| 46 | Exhibit B to Impinj's March 29, 2022 Final Infringement Contentions, "Infringement Claim Chart for U.S. Patent No. 7,215,251" |

**TABLE OF EXHIBITS**
**(CONTINUED)**

| Exhibit Number | Exhibit Description |
|---|---|
| 47 | Rebuttal Expert Report of Daniel W. Engels Ph.D. Regarding Non-Infringement of Asserted Claims of U.S. Patent Nos. 7,246,751; 8,665,074; 7,472,835; 7,733,227; and 10,776,198, dated March 20, 2023 |
| 48 | U.S. Patent No. 7,472,835, "RFID System Components Implementing Adjusted Backscatter Calculations And Methods," IMPINJ_NXP_WDTEX_00001954–1978 |
| 49 | U.S. Patent No. 7,388,468, "Method And System To Backscatter Modulate A Radio-Frequency Signal From An RFID Tag In Accordance With Both An Oscillation Frequency Signal And A Command Signal," IMPINJ_NXP_WDTEX_00001016–1044 |
| 50 | Opening Expert Report of Travis Blalock, Ph.D. Regarding Invalidity of U.S. Patent Nos. 7,116,240; 7,215,251; and 7,388,468, dated February 21, 2023 |
| 51 | |
| 52 | U.S. Patent No. 7,116,240, "Method And Apparatus For Controlled Persistent ID Flag For RFID Applications," IMPINJ_NXP_WDTEX_00000335–350 |
| 53 | Exhibit G to Impinj's March 29, 2022 Final Infringement Contentions, "Infringement Claim Chart for U.S. Patent No. 7,472,835" |
| 54 | Exhibit F to Impinj's March 29, 2022 Final Infringement Contentions, "Infringement Claim Chart for U.S. Patent No. 7,733,227" |
| 55 | Excerpts of the transcript of the 30(b)(6) deposition of Impinj's Chief Revenue Officer, Jeff Dossett, on behalf of Impinj, taken on November 14, 2022 |
| 56 | U.S. Patent No. 10,929,734, "RFID Tag Clock Frequency Reduction During Tuning," IMPINJ_NXP_WDTEX_00004126–4149 |
| 57 | U.S. Patent No. 10,776,198, "RFID Integrated Circuit Identifier Self-Check," IMPINJ_NXP_WDTEX_00004106–4118 |
| 58 | U.S. Patent No. 7,215,251, "Method And Apparatus For Controlled Persistent ID Flag For RFID Applications," IMPINJ_NXP_WDTEX_00000001–17 |

# INTRODUCTION

To the extent any of Impinj's nine asserted patents go to trial, the evidence will show there is no infringement. But for multiple reasons, Impinj's infringement allegations can and should be resolved summarily. NXP thus brings four motions for summary judgment herein:

**Motion #1:** Impinj's infringement claims overreach in seeking liability and damages for foreign sales. These sales are not actionable because, under the Supreme Court's test for evaluating whether a statute rebuts the presumption against extraterritorial application, §§ 271(b) and (c) do not rebut the presumption, and all of the relevant conduct for alleged indirect infringement occurred extraterritorially. NXP is here to defend and answer for its U.S. sales, but Impinj is not entitled to reach extraterritorial conduct.

In any event, Impinj cannot prove the elements of induced or contributory infringement for these foreign sales. Impinj has not traced any single product into the U.S., nor otherwise established any such foreign sales were imported here, and thus cannot show direct infringement. Nor can Impinj show the other elements for induced or contributory infringement, including specific intent to induce infringement. NXP does not control, or track, where its products go after it makes and sells them to foreign entities.

**Motion #2:** Impinj's direct infringement claims against products accused of infringing two of the patents-in-suit also overreach. Under Impinj's infringement theories, it is legally impossible for the Court or a jury to find that the accused products infringe, given the terms of a license binding on Impinj that obligates it to not assert, and to license, these claims to NXP.

**Motion #3:** For alleged infringement of 'the 734 Patent, Impinj asserts only a doctrine-of-equivalents theory, but that theory is legally barred by the disclosure-dedication doctrine: Impinj disclosed, but did not claim, the embodiment of the accused products, and therefore dedicated that embodiment to the public. As a matter of law, therefore, there can be no

infringement of the '734 Patent.

**Motion #4:**  Based on four common and straightforward claim requirements, Impinj cannot show infringement of five patents-in-suit, and summary judgment of should be granted on these grounds as well.

## LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014).  The movant bears the burden of demonstrating no genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant presents sufficient evidence that no genuine dispute of material fact exists, the burden of production shifts to the party opposing summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "[C]onclusory allegations unsupported by concrete and particular facts will not prevent an award of summary judgment." *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995).

## <u>MOTION #1</u>:  SUMMARY JUDGMENT OF NON-INFRINGEMENT SHOULD BE GRANTED AS TO THE FOREIGN SALES

NXP seeks summary judgment of no infringement and no damages for the sales by and to foreign entities (the "foreign sales") that Impinj accuses of indirectly infringing the asserted claims.  This portion of Impinj's infringement claim fails as a matter of law for a threshold reason: Sections 271(b) and 271(c) of Title 35, U.S.C., do not reach such extraterritorial conduct. The Court should thus grant summary judgment on this portion of Impinj's infringement claim.

Even setting aside that threshold issue, summary judgment is warranted for the foreign sales because Impinj cannot meet its burden on the elements of induced or contributory infringement for these sales, including the requisite underlying direct infringement.  Impinj has

2

no evidence that any foreign sale by and to a foreign entity ultimately ends up in the U.S. Impinj traced the products only to NXP's customers, and the evidence shows that those sales are all by and to foreign entities, and there is no further information as to the downstream route thereafter. And Impinj cannot show the remaining elements, such as specific intent to induce infringement in the U.S. NXP does not control or direct anything after its foreign sales to foreign entities.

Summary judgment of non-infringement should be granted as to the foreign sales.

## BACKGROUND

This case concerns ultra-high frequency ("UHF"), radio frequency identification ("RFID" or "RAIN") tags (also called RFID transponders). An RFID tag contains an integrated circuit ("IC") and other components. "RFID and its components, e.g., RFID tags and RFID readers, are used for 'contactless' identification applications via short-range communication through radio frequency waves." Ex. 50 (Blalock Opening Rpt.), ¶ 58.

Impinj accuses two NXP entities of infringement: NXP USA, Inc. (based in the United States) and NXP Semiconductors Netherlands, B.V. (based in the Netherlands). This motion refers to the defendants (and other NXP entities) collectively as "NXP," unless otherwise noted.

NXP makes and sells ICs; it does not make or sell RFID tags, which is the ultimate end product that is the target of Impinj's case. A number of steps and entities—all unrelated to NXP and not within its control or direction—are involved in the manufacture of the RFID tags that are ultimately sold to end users. Impinj's own expert Lauren Kindler describes this complexity, detailing a five-step supply chain. *See* Ex. 3 (Kindler Report), ¶ 34.[1] *First*, as she acknowledges, NXP—an "IC Manufacturer"—is at the very start of the chain. *Id. Second*, NXP,

---

[1] Unless stated otherwise, all exhibits cited herein are attached to the Declaration of Timothy J. Heverin, filed concurrently herewith.

Impinj, and other IC manufacturers sell the ICs, "either directly or indirectly through distributors," to "Inlay Manufacturers," which "assemble the endpoint ICs, antennae, and substrates into RFID tags." *Id. Third*, after that, the inlay manufacturers send the tags to "Specialty Conversion Firms," which "transform the inlays into physically finalized tags/labels." *Id. Fourth*, those firms send those products to "Service Bureaus" "for encoding information specific to the commercial needs of the end-users and their suppliers." *Id. Fifth*, the bureaus sell the finalized RFID tags to "End Users / RFID Adopters." *Id.* As Impinj describes it, this "multistep process" is "a complex route or path that any given IC might take in the marketplace," Ex. 4 (Apr. 25, 2022 Dossett Dep. Tr.) at 141:19-143:2, and the supply chain and its participants are "ALWAYS IN FLUX." Ex. 5 (Impinj's "Q217 MONZA SUMMIT" Presentation) at 70. While NXP generally does not track where its ICs go after it sells them to its customers, it accepts, as representative and for purposes of this Motion #1, these portrayals of the supply chain.

Given the convoluted and uncertain route that ICs travel well after leaving NXP's control, and given the worldwide marketplace, proof that NXP's ICs sold overseas actually make their way to the United States is a necessary element for Impinj's theories against NXP. Yet, during discovery, Impinj sought information only as to NXP's direct customers; Impinj did not seek any information further down the supply chain, nor did Impinj trace any NXP ICs into the U.S. Impinj merely requested documents and depositions from three inlay manufacturers (Avery Dennison, SML, and Checkpoint) related to their sales of "tags, labels or inlays containing" NXP's ICs. *See* Exs. 6-11. Even there, however, Impinj ultimately elected not to take any of those depositions.

To NXP's knowledge, Checkpoint did not produce any documents or testimony in

response to Impinj's requests, and Impinj did not pursue the issue further. ████████████

████████████████████████████████████████████████

████████████████████████████

      ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ NXP is not seeking dismissal as to those U.S. sales and

is here to defend them. ██████████████████████████████████████

██████████████████████████████

        In response to NXP's interrogatory on Impinj's purported evidence of inducement,

Impinj cited ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

████████████████████

Nonetheless, Impinj's damages request includes NXP foreign sales—sales by and to foreign entities. Ms. Kindler calculated damages by including not only all U.S. sales, but also ███ of foreign sales. *See* Ex. 3, ¶ 10 n.5. Impinj does not have admissible or adequate evidence supporting this estimate. Ms. Kindler's sources for her ███ rate—testimony from Impinj's Chief Revenue Officer, Jeff Dossett, and NXP Austria's Senior Director of RAIN RFID Solutions, Ralf Kodritsch, *id.*,¶¶ 10 n.3, 103 n.334—did not trace any NXP product into the United States, nor base their estimates on NXP's sales. Mr. Dossett admitted he had "no precise data" to support his estimate. Dkt. 71-1 ¶ 8. Moreover, he based these estimates on Impinj's experiences and interactions with its own customers, not upon on any actual knowledge of NXP's experiences and interactions with NXP's customers; Mr. Dossett offered no insight into NXP's sales, just his own belief. Ex. 55 (Nov. 11, 2022 Dossett Dep. Tr.) at 157:7-25; *see also* Ex. 17 (Kindler Dep. Tr.) at 206:11-21, 208:2-7. ██████████████

███████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

███████████████████

## ARGUMENT

### A.    Impinj's Theory Fails Under the Presumption Against Extraterritoriality

Impinj's entire claim directed to foreign sales cannot be squared with Supreme Court

precedent on the domestic limits of U.S. law.  In *RJR Nabisco, Inc. v. European Community*, 579

U.S. 325 (2016), the Supreme Court confirmed that "[i]t is a basic premise of our legal system

that, in general, 'United States law governs domestically but does not rule the world.'"  *Id.* at 335

(quoting *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007)).  "This principle finds

expression in a canon of statutory construction known as the presumption against

extraterritoriality."  *Id.*  "The presumption against extraterritorial application helps ensure that

the Judiciary does not erroneously adopt an interpretation of U.S. law that carries foreign policy

consequences not clearly intended by the political branches."  *Kiobel v. Royal Dutch Petroleum

Co.*, 569 U.S. 108, 116 (2013).

   *RJR Nabisco* set forth "a two-step framework" for evaluating whether a federal law

reaches extraterritorial conduct.  *See* 579 U.S. at 335, 377.  The first step is to determine whether

the law has only domestic application—i.e., whether the presumption of extraterritoriality

remains.  For the presumption to be rebutted, "the statute [must] give[] a clear, affirmative

indication that it applies extraterritorially."  *Id.*  "Absent clearly expressed congressional intent to

the contrary, federal laws will be construed to have only domestic application."  *Id.* at 335.

   If the presumption is not rebutted, the statue has only domestic application and the

second step assesses whether the conduct at issue in the case is nevertheless actionable —i.e.,

whether "the case involves a domestic application of the statute."  *Id.* at 337.  This inquiry

involves "looking to the statute's 'focus.'"  *Id.*  "If the conduct relevant to the statute's focus

occurred in the United States, then the case involves a permissible domestic application even if

other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign

country, then the case involves an impermissible extraterritorial application regardless of any

other conduct that occurred in U.S. territory," and is not actionable under the statute.  *Id.*

In *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129 (2018), the Supreme Court evaluated 35 U.S.C. § 271(f)(2) under the second step of the *RJR Nabisco* framework. Section 271(f)(2) provides that a company "shall be liable as an infringer" if it "supplies" certain components of a patented invention "in or from the United States" with the intent that they "will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States." 35 U.S.C. § 271(f)(2). In upholding the infringement liability and damages in that case, the Court relied on the fact that the conduct in the case that was "relevant to that focus clearly *occurred in the United States*, as it was ION's domestic act of supplying the components that infringed WesternGeco's patents." *WesternGeco*, 138 S. Ct. at 2137-38.

The presumption against extraterritoriality "applies with particular force in patent law." *Microsoft*, 550 U.S. at 444-45. The Supreme Court has long held: "Our patent system makes no claim to extraterritorial effect"; U.S. patent laws "do not, and were not intended to, operate beyond the limits of the United States, and we correspondingly reject the claims of others to such control over our markets." *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 531 (1972).

Impinj's claim against foreign sales fails as a matter of law under this two-step inquiry: Sections 271(b) and (c) do not rebut the presumption of extraterritoriality, and the conduct here relevant to those statutes' focus occurred overseas, beyond the actionable limits of the statutes.

Step one: Neither § 271(b) nor § 271(c) rebuts the presumption against extraterritoriality. Section 271(b) reads: "Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). Nothing in this short, single-sentence statute rebuts the presumption, much less by a "clear, affirmative indication." *See RJR Nabisco*, 579 U.S. at 337.

Likewise for § 271(c). Congress limited liability for contributory infringement to sales

and offers to sell "within the United States" and to importation "into the United States."  35 U.S.C. § 271(c).  That maintains, not rebuts, domestic-only application.[2]

Step two:  By their plain terms, the "focus" of §§ 271(b) and 271(c) is on the conduct of the alleged indirect infringer.  And here, that accused conduct occurs entirely overseas.

There should be no question that § 271(c) cannot reach the foreign sales to foreign entities.  By definition, those do not occur "within the United States" or involve "importation into the United States."  35 U.S.C. § 271(c).

Section 271(b) likewise does not permit Impinj to reach the accused foreign sales, made by and to foreign entities.  Section 271(b) is focused on the conduct that "actively induces infringement," 35 U.S.C. § 271(b), i.e., the active encouragement of another to infringe.  *ePlus, Inc. v. Lawson Software, Inc*., 789 F.3d 1349, 1360 (Fed. Cir. 2015) ("induced infringement requires active steps to encourage direct infringement").  For that conduct to amount to a domestic application of the statute, it cannot occur entirely overseas, which is the case here.

The Federal Circuit's evaluation of 35 U.S.C. § 271(g) is informative.  *See Syngenta Crop Prot., LLC v. Willowood, LLC*, 944 F.3d 1344 (Fed. Cir. 2019).  Section 271(g) provides infringement liability for "[w]hoever without authority imports into the United States or offers to

---

[2] Impinj's theory rests on Federal Circuit authority that applied a test directly contrary to the later *RJR Nabisco* two-step test.  In 2012, the Federal Circuit relied on 271(b)'s silence on territoriality to not "foreclose liability for extraterritorial acts that actively induce an act of direct infringement that occurs within the United States."  *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1302 (Fed. Cir. 2012).  *RJR Nabisco* flipped that very presumption and made clear that such silence is insufficient to support extraterritorial application; instead, a statute must include a clear and affirmative indication of such reach.  *See RJR Nabisco*, 579 U.S. at 336.  The Federal Circuit's only other decision on extraterritorial issues for § 271(b) merely applied *Merial* without analysis without citing or discussing *RJR Nabisco* or other controlling Supreme Court authority. *See Enplas Display Device Corp. v. Seoul Semiconductor Co.*, 909 F.3d 398, 408 (Fed. Cir. 2018).  Neither decision addressed the applicable standard and neither supports Impinj's claims here.

sell, sells, or uses within the United States a product which is made by a process patented in the United States."  The *Syngenta* court, evaluating "the nature of the infringing acts covered by § 271(g)," held that "the acts that give rise to liability under § 271(g) are the importation, offer for sale, sale, or use within this country of a product that was made by a process patented in the United States," i.e., "the focus is only on acts with respect to products resulting from the patented process," which did not include the act of "practicing the patented process abroad."  944 F.3d at 1359-60 (emphases omitted).  The court thus rejected the defendant's "attempt[] to shift the focus of [§ 271(g)] from domestic acts of importation, offer for sale, sale, or use of a product to cover a foreign act of practicing a patented process."  *Id.* at 1362.

Likewise here, § 271(b)'s "focus" is the alleged conduct that "actively induces infringement," requiring these acts to occur in the United States to constitute a permissible "domestic application" of the statute.  But that is not Impinj's case.  Setting aside foreign sales made to a U.S. entity (e.g., to NXP USA, which NXP is not seeking to dismiss and is prepared to defend and answer for), Impinj alleges induced infringement based on ***foreign*** sales and other conduct "***outside*** the United States."[3]  Ex. 15 at 19.  Specifically, according to Impinj's interrogatory response on its theory of induced infringement, ████████████████████ ███████████████████████████████████████████ ████████████████████████  But it is undisputed that NXP Netherlands (as well as NXP Japan and NXP Shanghai) is located abroad.  *E.g.*, Ex. 1 at -18731; Ex. 2 at -18715.  The geographic location of those sales, therefore, are abroad; any alleged affirmative acts associated with those sales likewise occurred abroad; and any intent was only to sell abroad.  Those sales thus do not involve a domestic application of § 271(b), so that portion

---

[3] All emphasis in this filing is added unless otherwise noted.

of Impinj's infringement case is precluded as a matter of law.

Under binding Supreme Court precedent, summary judgment to NXP is warranted as to the accused sales made by and to foreign entities.

**B.    Impinj Cannot Prove Indirect Infringement for the Foreign Sales**

Even assuming Impinj could pursue infringement liability for the foreign sales by and to foreign entities, Impinj cannot carry its burden on the necessary elements for §§ 271(b) and (c).

**1.    Impinj Cannot Prove Induced Infringement**

To carry its burden on induced infringement, Impinj must prove: (1) "direct infringement by some party"; and (2) a defendant "took an affirmative act to encourage infringement with the knowledge that the induced acts constitute patent infringement." *Largan Precision Co. v. Genius Elec. Optical Co.*, 646 F. App'x 946, 948 (Fed. Cir. 2016); *see* 35 U.S.C. § 271(b). Impinj cannot show either factor for the foreign sales by and to foreign entities.

**a.    Impinj Cannot Show Any Direct Infringement Arising from the Foreign Sales**

Impinj cannot prove that NXP's foreign sales to foreign entities actually entered the U.S. to constitute the requisite underlying element of direct infringement. The Federal Circuit's decisions in *Largan v. Genius*, *PI Advanced Materials v. Kaneka*, and *Power Integrations v. Fairchild Semiconductor* are directly on point.

In *Largan*, the Federal Circuit affirmed summary judgment of no induced infringement based on the patentee's lack of evidence of direct infringement. 646 F. App'x at 949. There, the parties were competitors in the manufacture and sale of camera lenses used in mobile phones and tablets. *Id.* at 947. The supply chain included four stages: the lens manufacturers like Largan and Genius, "module integrators," "system integrators," and end-product sellers like Apple. *Id*. For its inducement claim, "Largan only presented evidence that Genius lenses are incorporated in

some Apple products manufactured in Asia and that some Apple products are sold in the United States." *Id.* at 948. Largan's theory as to Genius-lens-containing Apple products sold in the U.S. was based on the assertion that "Apple's supply chain randomly selects between Genius's and Largan's lenses for shipments to the U.S.," such that a reasonable jury could find that the proportion of Genius-lens-containing Apple products sold in the United States was equal to the proportion of such Apple products sold worldwide. *Id.* But Largan failed to produce any evidence that the module or system integrators randomly selected lenses. *Id.* Because Largan "did not present any evidence from the supply chain to establish what process the [other third parties] used to select lenses in products destined for the United States," the Federal Circuit affirmed. *Id.* at 949.

Similarly, in *PI Advanced Materials v. Kaneka* (a declaratory-judgment case), the Federal Circuit affirmed summary judgment of no induced infringement based on Kaneka's lack of evidence of direct infringement. *See* 851 F. App'x 178, 183 (Fed. Cir. 2021). There, the parties were competitors in the manufacture and sale of polyimide film used in mobile phones. *See id.* at 179. The supply chain included five stages: the "polyimide film manufacturer[s]" like Kaneka and SKPI (now known as PI Advanced Materials), "laminate manufacturer[s]," "circuit board manufacturer[s]," "module maker[s]," and "set manufacturer[s] (e.g., Apple or Samsung Electronics)." *Id.* But Kaneka had no evidence tracing any accused products into the United States. *Id.* at 181-82. Although Kaneka had stale evidence tracing old, unaccused products into the United States, it failed to show that supply chain applied to the accused products, and its lack of any other tracing evidence, nor any other admissible evidence, warranted summary judgment to SKPI. *See id.* at 181-83 ("Kaneka's evidence lacks necessary information about what happens in the downstream supply-chain stages, or is otherwise stale—dating from a time (of-ten years)

before the accused films came to market.").

Finally, in *Power Integrations v. Fairchild Semiconductor*, the Federal Circuit vacated a remitted damages award for induced infringement where the amount of the remittitur was based on the percentage of worldwide sales of the accused products that eventually were imported into the United States.  711 F.3d 1348, 1374-76 (Fed. Cir. 2013).  There, the parties were competitors in the manufacture and sale of power circuits used in mobile phone chargers.  *See generally id*. Power Integrations' damages expert assumed that 18% of Fairchild's worldwide sales ended up in the United States based on two documents showing end-product seller Samsung's worldwide and United States sales.  *See id*.  The Federal Circuit found this assumption unreliable because, although "[a]rguably, [the expert's] data indicate[d] that during the relevant period 18% of Samsung's worldwide sales of mobile phones were sales in the United States," "the data [did] not support [the expert's] assumption that the 18% of Samsung's mobile phones sold in the United States included chargers incorporating [the] infringing circuits."  *Id*. at 1375-76.  Because the expert's assumption was unsupported, the Federal Circuit vacated the award.  *Id*. at 1376.

Just like these cases, Impinj cannot show that any NXP IC sold by and to foreign entities entered the U.S.  Ms. Kindler assumes that ▮▮ of NXP's foreign sales enter the United States. As an initial matter, as explained in NXP's concurrent motion to exclude, Ms. Kindler's ▮▮ assumption hinges on speculation rather than facts, and should be excluded.  *See* NXP's Motion To Exclude Certain Testimony Of Ronald Oliver, Lauren Kindler, Carl Sechen, Ph.D, and Paul Franzon, Ph.D., Motion #2.

But even assuming Ms. Kindler's opinions are admissible, her ▮▮ assumption is insufficient as a matter of law to show direct infringement.  As noted above, the ICs go through multiple stages and other entities before being ultimately incorporated into an RFID tag and

allegedly sold in the United States.  *See* Ex. 3, ¶ 34.  Like in *Kaneka* and *Largan*, neither Ms. Kindler nor any other Impinj witness made any attempt to trace or tie any of NXP's foreign sales through the supply chain into the U.S., nor does Impinj have any other tracing evidence.

While Impinj sought discovery ██████████████████████ at the second step of the supply chain, seeking information about their downstream customers (information that none of those three customers has any obligation to report to NXP, and none in fact provide any such formal reporting), Impinj took no steps to track any of the products after the second step.  And even as to the evidence on the second step, it directly undermines Impinj's ████ theory and the assumptions underlying it.  ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████ Impinj also declined to pursue depositions of any of the three inlay manufacturers, even though it had subpoenaed them for depositions, and Impinj did not pursue discovery from any customers further downstream. Ex. 7 (Subpoena to Avery Dennison); Ex. 9 (Subpoena to SML Group); Ex. 11 (Subpoena to Checkpoint Systems).  In short, Impinj failed to trace products into the United States to support its ████ theory.

Indeed, Impinj's Mr. Dossett admitted he had "no precise data" to support his estimate at all, Dkt. 71-1 ¶ 8, much less as to NXP's sales and whether any end up in the U.S.  Mr. Dossett confirmed that he did not receive any information from NXP and that his belief was based only on his "interactions at Impinj," and Ms. Kindler admitted that Mr. Dossett did not "have specific

insight into NXP."  Ex. 55 at 157:7-25; *see also* Ex. 17 at 206:11-21.  Mr. Dossett's "self-serving" "speculation, improbable inferences, [and] unsubstantiated assertions" about NXP's foreign sales "will not avoid summary judgment."  *Jones v. United States*, 936 F.3d 318, 321-23 (5th Cir. 2019) (affirming summary judgment for defendant where plaintiff's only evidence in opposition was too speculative); *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001) (affirming summary judgment for plaintiff where defendant's only evidence was his own "self-serving allegations").  None of Impinj's fact witnesses had anything to add beyond Mr. Dossett's conjecture, and none of Impinj's other experts offered any opinion on these questions.

Similarly, Mr. Kodritsch's ███ testimony cannot support direct infringement by a product sold overseas.



Like in *Largan*, *Kaneka*, and *Power Integrations*, Ms. Kindler's assumptions based on worldwide estimates and speculation are insufficient to show that ███ of *NXP's* products sold by and to foreign entities were eventually imported into the U.S.  Given Impinj's failure of proof, summary judgment of no direct infringement is warranted for the foreign sales by and to foreign entities.  *See Kaneka*, 851 F. App'x at 183; *Largan*, 646 F. App'x at 949; *Power Integrations*, 711 F.3d at 1376.

**b.    Impinj cannot show an affirmative act to encourage infringement through foreign sales by and to foreign entities.**

To show an affirmative act to induce infringement, Impinj must establish that NXP "possessed ***specific intent to encourage*** another's infringement and not merely that the defendant had knowledge of the acts alleged to constitute inducement." *Manville Sales Corp. v. Paramount Systems, Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990); *see also Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011) ("deliberate indifference to a known risk that a patent exists is not the appropriate standard under § 271(b)"); *Vita- Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1329 (Fed. Cir. 2009) ("intent to induce infringement cannot be inferred even when the defendant has actual knowledge that some users of its product may be infringing the patent"); *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1276 n.6 (Fed. Cir. 2004) ("sale of a lawful product by lawful means, with the knowledge that an unaffiliated, third party may infringe, cannot, in and of itself, constitute inducement of infringement.") (citation omitted).  This requires "evidence of culpable conduct, directed to encouraging another's infringement[.]" *DSU Med. Corp. v. JMS Co*., 471 F.3d 1293, 1306 (Fed. Cir. 2006).

In the context of multi-step supply chains, "induced infringement does not turn merely on a defendant's role in a product chain, but requires the defendant's affirmative action to recommend, encourage, promote, or suggest infringement." *Cal. Beach Co. v. Exqline, Inc*., No. C 20-01994 WHA, 2020 WL 6544457, at *3 (N.D. Cal. Nov. 7, 2020); *M2M Sols. LLC v. Motorola Sols., Inc*., No. CV 12-33-RGA, 2016 WL 70814, at *21 (D. Del. Jan. 6, 2016) (endorsing cases that "rejected the argument that a mere likelihood or possibility that component parts manufactured and shipped abroad will be imported to the United States is sufficient to sustain a claim for inducement").  The fact that a defendant sells components as the first step in a supply chain, and which may or may not result in a downstream infringing act, is insufficient to

show inducement.  *See, e.g., SynQor, Inc. v. Artesyn Techs., Inc.*, No. 2:11-CV-444, 2013 WL 12080731, at *17 (E.D. Tex. July 19, 2013) (report and recommendation to grant summary judgment of no intent to induce infringement, and rejecting argument "that Power-One knew if it sold unlabeled bus converters to Cisco that Cisco might bring them back into the United States"), *adopted*, 2013 WL 12085171 (E.D. Tex. July 29, 2013); *Pulse Elecs., Inc. v. U.D. Elec. Corp.*, No. 3:18-cv 00373-BEN-MSB, 2021 WL 981123, at *38 (S.D. Cal. Mar. 16, 2021) (knowledge of possible infringement by downstream importers did not constitute intent to induce infringement given the defendant's "lack of concern for where [the accused products] end up" and the fact that the defendant was only the first step of a multi-step supply chain); *Nichia Corp. v. Seoul Semiconductor Co.*, No. CV–06–0162 MMC, 2007 WL 2428040, at *4 (N.D. Cal. Aug. 22, 2007) (no inducement where defendant sold products to a third party, a subsidiary of which then sold products in the United States absent "evidence that [defendant] took any action to assist or otherwise encourage [the third party's] sales to its subsidiary").

Impinj has no evidence of any "affirmative act" by NXP Netherlands (or NXP USA) to induce its foreign affiliates or customers to import or sell any NXP product purchased abroad in the U.S. (i.e., to commit an infringing act).[4]  "[T]here can be no liability for active inducement when the actions alleged to induce infringement *could also lead to noninfringing activity*, and there is no encouragement *of the infringing activity in particular*."  *epicRealm, Licensing, LLC v. Autoflex Leasing, Inc*., 492 F. Supp. 2d 608, 639 (E.D. Tex. 2007).

The only evidence Impinj has cited are ███████████████████████████

███████████████████████████████████████████████████████████

---

[4] This argument of no affirmative act addresses only NXP Netherlands (and NXP USA to the extent Impinj seeks to somehow include that defendant in its claim for foreign sales) because NXP Japan and NXP Shanghai are not defendants, and therefore their intent is not relevant.

███████████████████████████████

██████████████████████████████

██████████████████████████████

███████████████████████████████

████████████████████████

███████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

████████████████████████████████

████████████████

Impinj also has not provided any evidence that NXP Netherlands (or NXP USA) affirmatively acted to induce foreign downstream customers to sell products incorporating NXP's products in the United States. NXP's sales are the first stage in "a multistep process" representing "a complex route or path that any given IC might take in the marketplace." Ex. 4 at 141:19-143:2. Yet Impinj made no attempt to discover evidence that any NXP entity, much less Netherlands or NXP USA, actively induced any entity in this multistep process. At most, Impinj subpoenaed three inlay manufacturers, obtained responses that undermine Impinj's theory, opted not to depose any of them, and proceeded no further. *See* pp. 5-6, above.

> **2.    Impinj Cannot Prove Contributory Infringement Based on Sales by and to Foreign Entities**

For the same reasons that Impinj cannot show direct infringement for purposes of induced infringement, it cannot meet the direct-infringement requirement for contributory

infringement either.  *See In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*, 681

F.3d 1323, 1333 (Fed. Cir. 2012) (It is "axiomatic that there can be no inducement or

contributory infringement without an underlying act of direct infringement.").  Additionally,

Impinj cannot show that NXP has contributed to any purported direct infringement with respect

to foreign sales.  As noted above, by definition, the foreign sales are not "within the United

States" or "import[ed] into the United States," 35 U.S.C. § 271(c).

<u>**MOTION #2:  SUMMARY JUDGMENT SHOULD BE GRANTED FOR THE '835
AND '227 PATENTS BECAUSE THEIR ASSERTED CLAIMS ARE NECESSARY TO
PRACTICE THE GEN2 STANDARD**</u>

NXP moves for summary judgment of non-infringement of the '835 and '227 Patents

(Exs. 48 & 30) based on Impinj's contractual obligations under the Gen2 standard.  Impinj

asserts infringement of these patents based on the accused products' alleged compliance with the

Gen2 standard.  But Impinj is barred from making that assertion because, by its participation in

the development of the Gen2 standard, Impinj is contractually barred from asserting

infringement against, and is contractually required to license, those who practice the standard,

without any non-infringing way to do so.  Of course, NXP believes Impinj's accusations of

infringement are incorrect.  But accepting the assertions at face value, infringement is legally

impossible and the allegations themselves are barred by contract.  Therefore, the jury need not be

compelled to decide the infringement or validity of two of these two asserted patents.

**BACKGROUND**

The Gen2 standard is an industry-wide protocol for certain wireless RFID

communications, established by the standard-setting organization EPCglobal.  Ex. 21 (Engels

Opening Rpt.), ¶ 9.  The Gen2 standard was developed by industry members known as "Working

Group Participants," which included Impinj and NXP.  *Id.*, ¶ 76.

EPCglobal has an IP Policy that governs its work.  As relevant here, Section 3.1 of the

19

Policy provides that each Working Group Participant "shall not assert, and shall grant …, a nonexclusive, nontransferable, non-sublicensable, worldwide royalty-free and otherwise reasonable and non-discriminatory license upon request in, its Necessary Claims to other Participants in the Working Group." Ex. 23 at -17037.  The Policy defines this as a "covenant of non-assertion and license," *id.*, and further states the Policy may be raised "as a binding admission in defense of a claim of infringement in any jurisdiction." *Id.* at ¶ 6.4 (at -17040-17041).  The Policy defines "Necessary Claims" as "all present, pending and hereafter acquired patent claims that would be necessarily infringed by implementing the Specification," and further states that "[a] claim is necessarily infringed only when it is not possible to avoid such infringement because there is no non-infringing alternative for implementing the Specification." *Id.* at -17036.

In relation to the Gen2 standard, Impinj and NXP each agreed to abide by the IP Policy. Ex. 25 at 103:12-20; Ex. 51; Ex. 22; Ex. 24 (Impinj's Responses to NXP USA, Inc.'s First Set of Requests for Admission (Nos. 1–34)) at 17 (Response to No. 15:  "Impinj admits that it agreed to abide by the EPCglobal Intellectual Property Policy Working Group Declaration."); *see* Dkt. 101 ¶¶ 3-14, 190-197.

## ARGUMENT

This Motion #2 rests on the EPCglobal IP Policy, and the issue is narrow.  Under the IP Policy, Impinj agreed to a "covenant of non-assertion and license" for any and all "Necessary Claims" for implementing the Gen2 standard in a product.  Ex. 23 at -17037, -17041.  Under the express terms of the IP Policy, NXP is entitled, as a defense to an allegation that it is infringing a "Necessary Claim[]," to raise the Policy and its terms "as a binding admission" by Impinj.  *Id.* at ¶ 6.4 (at -17041).  A "Necessary Claim[]" is a patent claim "that would be necessarily infringed by implementing the Specification" of Gen2, and "[a] claim is necessarily infringed only when it

is not possible to avoid such infringement because there is no non-infringing alternative for implementing the Specification." *Id.* at -17036.

Impinj's infringement assertions, accepted for purposes of this Motion #2, narrow the issue. Given Impinj's assertions, the inquiry here rests on two questions: (1) Do the accused products implement the Gen2 standard in a manner that practices the asserted claims? (2) If so, are there no non-infringing alternatives, i.e., is there is no way to design around the (alleged) infringement and still implement the Gen2 standard? If the answers are both "yes," the claim is a "Necessary Claim," Impinj cannot assert infringement, and it is obligated to convey a royalty-free license to NXP for the claim.

The answer to both questions here is "yes." We address these in reverse order below. As discussed in Argument A below, Impinj does not assert there are any non-infringing alternatives for the products accused of infringing the '835 and '227 Patents. Thus, the only issue remaining is whether the accused products implement the Gen2 standard in a manner that practices the asserted claims. As discussed in Argument B below (and, again, accepting as the premise that there is infringement as Impinj alleges), the accused products infringe in a manner that implements the Gen2 standard. There is no genuine issue of material fact on these points. Accordingly, these asserted claims are necessary to practice Gen2, and Impinj is precluded from asserting infringement of these asserted claims and is obligated to convey a royalty-free license to NXP.[5] "An express or implied license is a defense to infringement." *Radar Indus., Inc. v.*

---

[5] To be clear, NXP disputes Impinj's assertions that the accused products infringe and that there are no non-infringing alternatives. *See, e.g.*, Motion #4, Arguments B-C, below (NXP non-infringement arguments for the '835 Patent); *see also* Ex. 29 (Sechen Rebuttal Rpt.), ¶¶ 691, 692 (addressing non-infringing alternatives for the '835 Patent); Ex. 27 (Franzon Rebuttal Rpt.), ¶ 640 (addressing non-infringing alternatives for the '227 Patent). But it is not necessary to reach those issues, given Impinj's infringement assertions. If, as Impinj contends, NXP's products infringe the '835 and '227 Patents and no non-infringing alternatives exist, neither the

*Cleveland Die & Mfg. Co.*, 424 F. App'x 931, 933 (Fed. Cir. 2011). This includes compliance with the terms of an agreement between a patent owner and a standard setting organization, which is "a matter of [] contract law." *HTC Corp. v. Telefonaktiebolaget LM Ericsson*, 12 F.4th 476, 484 (5th Cir. 2021);*see also King Pharm., Inc. v. Eon Labs., Inc.*, 616 F.3d 1267, 1282 (Fed. Cir. 2010) (holding that a covenant not to sue for infringement "remove[s] any case or controversy that may have existed between the parties at one point").

### A.   Impinj Identified No Non-Infringing Alternatives for the Asserted Claims of the '835 and '227 Patents

As NXP's expert Dr. Daniel Engels opined, there are no Gen2-compliant or technically acceptable non-infringing alternatives to the asserted claims of '835 and '227 Patent, as alleged by Impinj. Ex. 33 (Engels Opening Rpt., '835 Patent Grounds) at ¶¶ 1117-1120; Ex. 35 (Engels Opening Rpt., '227 Patent Grounds) at ¶ 4299. Under Impinj's theories, it cannot show there are non-infringing alternatives that nonetheless still implement Gen2.

Impinj's experts who opine on infringement for the asserted claims of the '835 and '227 Patents—Dr. Carl Sechen and Dr. Paul Franzon—do not identify any such non-infringing alternatives. Dr. Sechen does not even attempt to offer one. And although Dr. Franzon offers a single alternative for the '227 Patent, he does not show that the alternative meets the requirements of the Gen2 standard, nor could he. *See* Ex. 27 (Franzon Rebuttal Rpt.), ¶ 638.

Dr. Franzon opines only that the prior art discloses setting a WRITE_OK flag if a

---

jury nor the Court could find NXP liable for infringement, given Impinj's "covenant of non-assertion and license" that precludes Impinj's allegations themselves and authorizes NXP to practice the '835 and '227 Patents. Ex. 23 at -17037. Accordingly, while NXP preserves all of its arguments for its other motions and for trial, the Court can decide this Motion #2 based simply on Impinj's assertions. *See Clearmeadow Invs., LLC v. United States*, 87 Fed. Cl. 509, 529 (2009) ("[A] party may concede a fact for purposes of its own summary judgment motion and yet reserve the right to litigate that fact should its motion be overruled.").

*previous* write operation were performed correctly, which he opines may be determined by performing a "second read . . . to verify that the write was performed correctly." *Id.* But that does not comport with the ***Gen2 standard***. Gen2 requires that if a Tag encounters an error with a Write command, "then the Tag shall backscatter an error code as shown in Table I.1." Ex. 28 (Gen2 Specification, v1.1.0), Annex I; *see also* Ex. 35 (Engels Opening Rpt., '227 Patent Grounds), ¶ 4295. Gen2 specifies that if "[t]he Tag has insufficient power to perform the memory-write operation," it shall backscatter the error code $000010112$. Ex. 28, Annex I, Table I.2; *see also* Ex. 35 (Engels Opening Rpt., '227 Patent Grounds), ¶ 4295.[6] That is, Gen2 ***requires*** determining power adequacy ***before executing*** a write command, not afterwards by a subsequent read attempt, as Dr. Franzon suggests.

In short, under Impinj's theory of infringement, there are no non-infringing alternatives for a product practicing the '835 and '227 Patents.

**B.    Under Impinj's Infringement Assertions, the Products Accused of Infringing the Asserted Claims of the '835 and '227 Patents Implement Gen2**

In the absence of non-infringing alternatives, the key issue as a matter of law, therefore, is whether, based on Impinj's infringement assertions, the accused products implement the Gen2 standard in a manner that practices the asserted claims. Given the breadth with which Impinj applies its claims, the answer is yes: Accepting Impinj's infringement allegations, the accused products implement the Gen2 standard in a manner that practices the asserted claims. Impinj is therefore contractually prohibited from advancing its allegations.

---

[6] If the Tag does not support specific error codes, it instead returns a non-specific error code $000011112$. Ex. 28, Annex I.

### 1. Under Impinj's Infringement Assertions, the Products Accused of Infringing the Asserted Claims of the '835 Patent Implement Gen2

Impinj asserts claims 1, 41, 52, and 61 of the '835 Patent.  Dkt. 162-1.  Under Impinj's infringement theories, the accused products practice the Gen2 standard, and in a manner that practices the asserted claims.  In fact, Impinj's counsel expressly represented early in this dispute that NXP's UCODE 8 product infringed claim 1 **because** it complies with Gen2.  For claim 1, Impinj's counsel pointed to the accused products' datasheet stating "EPC Gen2v2 compliance," and asserted, "[t]herefore," that the accused products practice the claim:



Ex. 31 at -209542.

Moreover, NXP's expert Dr. Engels agreed that, under Impinj's infringement theories, claim 1, and the remaining asserted claims 41, 52, and 61, are necessary to practice the Gen2 standard.  Ex. 33 (Engels Opening Rpt., '835 Patent Grounds), ¶¶ 1102-1123, 1136-1147, 1153-1162.

An analysis of the claims and the Gen2 standard (under Impinj's infringement assertions) confirms this.  The analysis below for claim 1 applies equally to claims 36 and 52, the claims

from which asserted claims 41 and 61 depend.

- **Claim 1 preamble: "RFID tag"**

The preamble recites an "RFID tag." Ex. 48 ('835 Patent). (Claim 36 likewise recites a "method for an RFID tag," and claim 52 recites "a circuit for an RFID tag having an antenna.") The Gen2 standard specifies certain wireless RFID tags; the accused products (when incorporated into tags with additional components, e.g., an antenna) implement the Gen2 standard in a manner that practices this limitation. *See* Ex. 33 (Engels Opening Rpt., '835 Grounds), ¶¶ 1107-1108.

- **Claim element 1(a): "a demodulator to demodulate waveforms from an RFID reader that encode a gross number and a divide ratio, the gross number being expressed in terms of bits"**

Claim 1 requires "a demodulator to demodulate waveforms from an RFID reader that encode a gross number and a divide ratio, the gross number being expressed in terms of bits." Ex. 48 ('835 Patent). Accepting Impinj's infringement allegations, the accused products implement the Gen2 standard in a manner that practices this limitation. Ex. 33 (Engels Opening Rpt., '835 Grounds), ¶¶ 1109-1112. Gen2 requires that the incoming waveform encodes a gross number (which Impinj identifies as TRcal) and a divide ratio. *Id.*, ¶ 1016. The gross number encoded in the waveform, as Impinj asserts infringement, is expressed in terms of bits. *Id.*, ¶ 1017. Dr. Sechen admitted that Gen2 requires the waveform sent from the reader to specify the tag's backscatter link frequency, which he agreed must be calculated from an encoded TRcal (the claimed gross number) and a divide ratio under Gen2 as well. Ex. 32 (April 7, 2023 Sechen Dep. Tr.) at 284:20-285:22; 290:8-11; Ex. 20, ¶ 491. There is no genuine dispute that this element is necessary to practice Gen2.

Impinj accuses NXP's demodulator of infringing this limitation (Ex. 20 (Sechen Opening

Rpt.), ¶¶ 493, 503, 506), as it must, because the Gen2 demodulating requirement may only be performed by a demodulator. Ex. 33 (Engels Opening Rpt., '835 Patent Grounds), ¶¶ 1109-1112. Dr. Sechen admits this. Ex. 32 at 282:22-25.

Impinj's Final Infringement Contentions accuse infringement of claim element 1(a) by mapping to Sections 6.3.1.2.8 and 6.3.1.4 of Gen2, quoting it verbatim to support the premise that "[t]he UCODE Products demodulate waveforms from an RFID reader that encode a gross number and a divide ratio, the gross number being expressed in terms of bits" and "[t]he gross number and DR are express in terms of bits with the most-significant bit transferred first." Ex. 53 (Impinj's Final Infringement Contentions, '835 Patent Chart) at 6-7.

- **Claim element 1(b): "a processor to determine a result by dividing the gross number by the divide ratio and adding an adjustment, in which the dividing takes place by discarding at least one of the bits"**

Claim 1 recites "a processor to determine a result by dividing the gross number by the divide ratio and adding an adjustment, in which the dividing takes place by discarding at least one of the bits." Ex. 48 ('835 Patent). Accepting Impinj's infringement allegations, the accused products implement the Gen2 standard in a manner that practices this limitation. Ex. 33 (Engels Opening Rpt., '835 Patent Grounds) at ¶¶ 1113-1120. This limitation recites a mathematical calculation that Gen2 requires. *See id.* Impinj acknowledged this in its Final Infringement Contentions. *See id.*, ¶¶ 1016, 1024. Gen2 also requires that the math be done by "discarding" bits. *See id.*, ¶1120. Impinj's Ronald Oliver testified that the division required by the '835 Patent calculation is performed by bit-shifting. *See* Ex. 34 (Feb. 21, 2023 Oliver Decl.), ¶ 14. Bit-shifting division is a standard method of dividing binary values and is performed by "discarding" bits. *See* Ex. 32 at 307:25-308:2. Bit-shifting division discards any remainder by ***always rounding the result down*** to the nearest whole number. Ex. 20 (Sechen Opening Rpt.), ¶¶ 138, 144. The claimed adjustment compensates for this. Without adding an adjustment, the

'835 Patent discloses that rounding down exclusively will cause the calculated frequency results to be out of compliance with Gen2. *See id.*; Ex. 33 (Engels Opening Rpt., '835 Patent Grounds), ¶ 1120.  The addition of the adjustment is necessary to ***round both up or down***, to the nearest whole number, which in turn is necessary to maintain Gen2's specified frequency tolerances. *Id.* Thus, the adjustment is necessary to practice Gen2; without the adjustment the tag could not comply.[7]

According to Impinj's infringement theory, a "processor" is required to perform the claimed calculation; Impinj provides no evidence of another way. *See id.*, ¶¶ 1114; *see also* Motion #4, Argument C, *infra* (discussing the "processor" limitation).  The limitation requires calculation of a backscatter link period (the "symbol period" or "result" applied in limitation 1(c) below) by dividing the gross number (TRcal) by a divide ratio, or BLP=TRcal/DR.  Impinj's CEO and Rule 30(b)(6) witness, Dr. Chris Diorio, testified that this equation is mathematically equivalent to calculating the backscatter link (symbol) *frequency* by dividing the divide ratio by TRcal, or BLF=DR/TRcal, because frequency is the inverse of period.  Ex. 25 at 151:11-20. Dr. Sechen confirmed Dr. Diorio's testimony, admitting that Gen2 specifies the mathematical equation for calculating that backscatter link frequency, which is equal to dividing the divide ratio by TRcal.  Ex. 32 at 290:12-23.  There is no material dispute that Gen2 requires the recited math.

Impinj's Final Infringement Contentions accuse infringement of claim element 1(b) by

---

[7] Dr. Sechen opines that Dr. Engels does not identify where Gen2 specifies that division must be implemented using right shifts, (Ex. 29 (Sechen Rebuttal Rpt.), ¶ 693), but the claims do not recite right shifts.  Dr. Sechen disputes that Dr. Engels identified that Gen2 requires adding an error adjustment (*id.*), but does not dispute that without adding an adjustment, the '835 Patent discloses that the rounding errors (i.e., that round down exclusively) will cause the results to be out of compliance with Gen2.  Accordingly, Dr. Sechen raises no dispute as to the facts stated above.

mapping to Sections 6.3.1.2.8 and 6.3.1.6 of Gen2, quoting it verbatim, in part, to support the premise that "[t]he backscatter link frequency (BLF) of the Gen2 Spec is the inverse of the link period (Tpri) (a.k.a. backscatter link period (BLP))."  Ex. 53 (Impinj's Final Infringement Contentions, '835 Patent Chart) at 11.

- **Claim element 1(c): "a modulator to backscatter a tag waveform that includes symbols using a symbol period determined from the result."**

Finally, claim 1 recites "a modulator to backscatter a tag waveform that includes symbols using a symbol period determined from the result."  Ex. 48 ('835 Patent).  Accepting Impinj's infringement allegations, the accused products implement the Gen2 standard in a manner that practices this limitation.  Ex. 33 (Engels Opening Rpt., '835 Patent Grounds), ¶¶ 1121-1123.  Gen2 requires that the RFID tag modulate and backscatter outgoing waveforms from the tag.  *See id.*  Modulation requires a modulator, and that is what Impinj accuses.  Ex. 20 (Sechen Opening Rpt.), ¶¶ 536, 544, 554.  Dr. Sechen admitted that a modulator is necessary to backscatter the tag waveform.  Ex. 32 at 283:1-4.  Gen2 also specifies that the waveform must include data encoded as symbols, and that the symbol period is determined from the result of the calculations in limitation 1(b).  *See* Ex. (Engels Opening Rpt., '835 Patent Grounds), ¶¶ 1122-1123.  Dr. Sechen does not dispute that Gen2 requires use of a symbol period determined by the result (e.g., backscatter link period).  *See* Ex. 29 (Sechen Rebuttal Rpt.), ¶ 469; Ex. 32 at 356:13-18.  Indeed, this is fundamental to Gen2 compliance.  *See* Ex. 33 (Engels Opening Rpt., '835 Patent Grounds), ¶ 1123.

Impinj's Final Infringement Contentions accuse infringement of claim element 1(c) by mapping to Sections 6.3.1.3, 6.3.1.3.1, 6.3.1.3.2, and 6.3.1.3.2.1 and Tables 6.9 and 6.10 of Gen2, quoting it verbatim, in part, to support numerous premises including: "[t]he UCODE Products backscatter a tag waveform that includes symbols using a symbol period determined

from the result," a "[m]odulator modulates the backscatter using ASK and/or PSK modulation,"

"[t]he backscattered data is encoded in FMO which symbols using a symbol period and

determined from the result," and "[t]he waveform includes symbols using a symbol period

determined from the result."  Ex. 53 (Impinj's Final Infringement Contentions, '835 Patent

Chart) at 16-18.

### 2.    Under Impinj's Infringement Assertions, the Products Accused of Infringing the Asserted Claims of the '227 Patent Implement Gen2

Impinj asserts claims 38, 43, and 63 of the '227 Patent.  Dkt. 162-1.  Accepting Impinj's

infringement allegations (here, in connection with a Gen2 write operation), the accused products

implement the Gen2 standard in a manner that practices these claims.  Gen2 specifies that if an

RFID tag encounters an error with a write operation, then the reader must backscatter an Annex I

error code.  *See* Ex. 35 (Engels Opening Rpt., '227 Patent Grounds), ¶¶ 4293-4296.  Gen2

specifies an "insufficient power" error code that indicates that "[t]he tag has insufficient power to

perform the memory-write operation."  *Id.*, ¶ 4295.  Gen2 also specifies that if an RFID tag

successfully performs a write operation (e.g., there is no insufficient power error code to send)

then a tag must backscatter a reply specified in Table 6.34 of Gen2.  *Id.*, ¶ 4294; *see also id.*,

¶ 4293, Fig. 6.23 (requiring that a tag determines whether a power adequacy condition is met

(i.e., "has sufficient power to execute kill") for performing the Gen2 Kill command).

As the evidence shows, the asserted claims of the '227 Patent are necessary to practice

Gen2.  The limitation-by-limitation analysis below for claim 38 applies equally to claim 43 that

depends from claim 38, and to claim 63, the other independent asserted claim.

- **Claim 38 preamble:  "RFID tag"**

The preambles of claims 38 and 63 each recite the claims are directed to "a Radio

Frequency Identification (RFID) circuit for use in an RFID tag."  Ex. 30 ('227 Patent).  Gen2

standardizes certain wireless RFID tags; the accused IC products (when incorporated into tags with additional components, e.g., an antenna) implement the Gen2 standard in a manner that practices the preamble under Impinj's infringement theories.  Ex. 35 (Engels Opening Rpt., '227 Patent Grounds), ¶¶ 4230-4233, 4286.  And as Impinj indicates in its Final Infringement Contentions, the limitations in claim 63 are substantially similar or identical to those in claim 38 for the purposes of deciding necessity to practice Gen2.  Ex. 54 (Impinj's Final Infringement Contentions, '227 Patent Chart), 27-28.[8]

- **Claim element 38(a): "a first circuit arranged to receive a command associated with a tag operation from an RFID reader."**

Claim 38 requires "a first circuit arranged to receive a command associated with a tag operation from an RFID reader."  Ex. 30 ('227 Patent).  Accepting Impinj's infringement allegations, the accused products implement the Gen2 standard in a manner that practices this limitation.  Ex. 35 (Engels Opening Rpt., '227 Patent Grounds) at ¶¶ 4288-4291.  Gen2 requires that the RFID tag receive commands for a number of tag operations (e.g., Read command, Write command, etc.).  *Id.*, ¶¶ 4237, 4290.  Gen2 requires that the RFID tag demodulates incoming waveforms (RF signals) carrying such commands, received from the reader; this necessarily requires a circuit for receiving those waveforms.  *Id.*, ¶¶ 4236-4239, 4288-4291.

Dr. Franzon disputes that Gen2 requires certain circuitry or structure and opines that Gen2 does not disclose "a first circuit arranged to receive a command."  Ex. 27 (Franzon Rebuttal Rpt.), ¶ 356.  Dr. Franzon ignores that the '227 Patent claims do not require any specific circuitry—only that there are generic first or second or third "circuits," which the claims define

---

[8] For claim 63, Impinj refers to its claim 38 analysis for all but one limitation:  "arranged to transmit a non-compliance response to the reader if the power adequacy condition is not met," for which Impinj asserts only that that "UCODE Products . . . transmit an error code," which Gen2 requires as discussed above.  Ex. 54 (Impinj's Final Infringement Contentions, '227 Patent Chart), 28.

only by their function.  *See* Ex. 30, ('227 Patent).  Gen2 requires the claimed functionality, which necessarily must be carried out in circuitry.  Defining the "circuit" that receives the RF signal as "first" or "second" is immaterial to whether Gen2 requires such circuitry.[9]

Regardless, Dr. Franzon reads this limitation on the demodulator of the accused products (Ex. 41 (Franzon Opening Rpt.), ¶¶ 155, 161, 166), which Dr. Sechen admitted is necessary to practice Gen2, as discussed above; Impinj's experts identify no way to practice the limitation without a "first circuit." Ex. 32 at 282:22-25.

- **Claim element 38(b): "a second circuit arranged to determine, responsive to the received command, whether a power adequacy condition is met for performing the tag operation, and if so to perform the tag operation in response to the received command, else not to perform the tag operation."**

Claim 38 recites "a second circuit arranged to determine, responsive to the received command, whether a power adequacy condition is met for performing the tag operation, and if so to perform the tag operation in response to the received command, else not to perform the tag operation."  Ex. 30 ('227 Patent).  Accepting Impinj's infringement allegations, the accused products implement the Gen2 standard in a manner that practices this limitation.  Ex. 35 (Engels Opening Rpt., '227 Patent Grounds), ¶¶ 4292-4300.  Gen2 specifies that if an RFID tag encounters an error with a write operation, then the reader must backscatter an Annex I error code.  *See id.*, ¶¶ 4293-4296.  Gen2 specifies an "insufficient power" error code that indicates that "[t]he tag has insufficient power to perform the memory-write operation."  *Id.*, ¶ 4295. Gen2 also specifies that if an RFID tag successfully performs a write operation (e.g., there is no insufficient power error code to send) then a tag must backscatter a reply specified in Table 6.34

---

[9] Dr. Franzon identified "first" and "second" circuits merely by identifying what components were needed to accomplish the recited functionality.  *See* Ex. 26 (April 4, 2023 Franzon Dep. Tr.) at 124:18-24.

of Gen2.  *Id.*, ¶ 4294.

Dr. Franzon argues that the Gen2 Specification does not require a power adequacy check because the RFID tag may send a reply shown in Table 6.34 [*sic* 6.33] to the reader, which indicates that the write operation completed successfully.  Ex. 41 (Franzon Opening Rpt.), ¶ 603. But Dr. Franzon fails to cite ***the very next paragraph*** in the Gen2 Specification, which states: "The Tag encounters an error: The Tag shall backscatter an error code during the CW period ***rather than the reply shown in Table 6.33*** (see Annex I for error-code definitions and for the reply format)."  Ex. 28, § 6.3.2.10.3.3.  This includes the error codes triggered by an insufficient power condition.  *See id*., Annex I.

\*      \*      \*

In short, under Impinj's infringement theories, there can be no dispute that the asserted claims of the '835 and '227 Patents are "Necessary Claims" for implementing the Gen2 standard. Accordingly, by operation of the Gen2 IP Policy, Impinj is precluded from asserting infringement of those claims (and must grant Impinj a license thereto), and summary judgment of non-infringement should be granted to NXP for these two patents.

### <u>MOTION #3</u>:  SUMMARY JUDGMENT OF NON-INFRINGEMENT SHOULD BE GRANTED FOR THE '734 PATENT BECAUSE IMPINJ IS LEGALLY BARRED FROM ASSERTING THE DOCTRINE OF EQUIVALENTS, ITS ONLY THEORY

As a matter of law, NXP does not infringe either asserted claim of the '734 Patent (claims 1 and 15) because the claims require two oscillators and the accused products have only one. Although Impinj tries to assert a doctrine-of-equivalents argument, that argument is legally barred by the disclosure-dedication doctrine:  Impinj disclosed, but did not claim, a one-oscillator embodiment, and therefore dedicated that embodiment to the public.  As a matter of law, therefore, there can be no infringement under a doctrine-of-equivalents theory.

## BACKGROUND

Claims 1 and 15 each require two distinct oscillators: "a first oscillator configured to provide a first clock frequency," and "a second oscillator configured to provide a second clock frequency." Ex. 56 ('734 Patent). The accused products do not have two oscillators; they have only one oscillator. This is undisputed. Ex. 41 (Franzon Opening Rpt.), ¶ 513 (UCODE 8/8m), ¶ 518 (UCODE 9).

## ARGUMENT

The only issue here is alleged infringement under the doctrine of equivalents ("DOE"). Impinj agrees that the lack of two oscillators in the accused products precludes literal infringement. As Impinj's expert Dr. Franzon admitted:

> Q. Okay. So if you go to the claims of the '734 patent, claim 1, do you agree that claim 1 requires both a first oscillator and a second oscillator?
>
> ….
>
> A. Claim 1 has words that say a first oscillator and a second oscillator. I believe UCODE provides that under the doctrine of equivalents.
>
> *Q. Does it provide it under the doctrine of literal infringement?*
>
> *A. No.*

Ex. 36 (April 5, 2023 Franzon Dep. Tr.) at 360:15-361:1.

The claims do not infringe under DOE, either. Although Impinj asserts that the accused products' one-oscillator arrangement is a purported equivalent, the '734 Patent discloses, but does not claim, exactly the one-oscillator arrangement. Impinj's DOE theory is thus precluded as a matter of law under the disclosure-dedication doctrine.

The disclosure-dedication doctrine bars application of the DOE "when a patent drafter discloses but declines to claim subject matter[.]" *Johnson & Johnston Assocs. Inc. v. R.E. Serv.*

33

*Co.*, 285 F.3d 1046, 1054 (Fed. Cir. 2002) (en banc).  Although infringement under the doctrine

of equivalents is a question of fact, whether the disclosure-dedication rule bars a specific

assertion of equivalents is a question of law amenable to summary judgment.  *See Toro Co. v.*

*White Consolidated Indus., Inc.*, 383 F.3d 1326, 1333 (Fed. Cir. 2004); *see also Warner-*

*Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 n.8 (1997) ("Of course, the various

legal limitations on the application of the doctrine of equivalents are to be determined by the

court, either on a pretrial motion for partial summary judgment or on a motion for judgment as a

matter of law at the close of the evidence and after the jury verdict.").

 The disclosure-dedication doctrine bars an asserted equivalent where the specification

discloses the unclaimed subject matter with "such specificity that one of ordinary skill in the art

could identify the subject matter that had been disclosed and not claimed."  *PSC Comput. Prods.,*

*Inc. v. Foxconn Int'l, Inc.*, 355 F.3d 1353, 1360 (Fed. Cir. 2004).

 The Federal Circuit's decision in *CSP Technologies, Inc. v. Sud-Chemie AG* is

instructive.  There, the court affirmed summary judgment of non-infringement, including under

the DOE.  643 F. App'x 953, 959-60 (Fed. Cir. 2016).  The court agreed that the accused single-

piece containers did not literally infringe because the claims required containers with two pieces:

a main "container" and a separate "upper housing portion."  *Id*. at 954-55, 957.  The court also

agreed that the disclosure-dedication doctrine barred single-piece containers as an equivalent

because the patent expressly disclosed not only two-piece containers but also a "one-piece

container without a separable upper housing portion."  *Id*. at 958.

 Likewise here, the disclosure-dedication doctrine bars a single-oscillator embodiment as

an equivalent, because the '734 Patent expressly discloses, but does not claim, that embodiment.

In Figure 11 and accompanying text, the '734 Patent discloses a single-oscillator embodiment:



Ex. 56 ('734 Patent), Fig. 11.  Moreover, the '734 Patent expressly distinguishes between its single-oscillator and two-or-more-oscillators embodiments.  *See id.* at 15:60-16:11 (distinguishing between embodiments with "an oscillator" and "multiple oscillators" where "[i]n some embodiments, at least one oscillator may be adjustable … while at least one other oscillator may not be adjustable"); *id.* at 17:36-47 (distinguishing between embodiments where "the IC may reduce its current clock frequency by adjusting an IC oscillator" and where "the IC may include at least two oscillators").  By not claiming the one-oscillator embodiment, Impinj dedicated it to the public, and there can be no infringement by such an embodiment.

There is no doubt Impinj is attempting to recapture via DOE that which it disclosed but did not claim.  Impinj's own expert Dr. Franzon tied the accused products' single oscillator design to Figure 11 of the '734 patent in his report.  *See id.* ¶¶ 512, 513.  He went on to reinforce the point at deposition:

> Q. Okay.  So it's a single oscillator [in NXP's products] that produces more than one frequency as an output?
>
> A. It's a single circuit much like the one in the figure taken from the patent illustrated above that produces more than one frequency.
>
> Q. Okay. And that figure is -- or the element is 1102?
>
> A. Yes.
>
> Q. And that's from Figure 11?

    A. Yes.

Ex. 36 at 359:23-360:7; *see also id.* at 360:15-23 ("Claim 1 has words that say a first oscillator

and a second oscillator.  I believe UCODE provides that under the doctrine of equivalents.").

But Impinj and Dr. Franzon cannot assert DOE.  A one-oscillator embodiment as disclosed in

Figure 11 was not claimed, and therefore was dedicated to the public.  Impinj's DOE theory is

thus barred.

    The Court should grant summary judgment of non-infringement of the '734 Patent.

**MOTION #4:  SUMMARY JUDGMENT OF NON-INFRINGEMENT SHOULD BE GRANTED FOR FIVE PATENTS BECAUSE IMPINJ CANNOT SHOW THAT THE ACCUSED PRODUCTS MEET FUNDAMENTAL LIMITATIONS**

    NXP moves for summary judgment of non-infringement of four straightforward claim

terms with a plain and ordinary meaning and for which Impinj has a complete absence of proof.

These common terms—"processing block," "transponder," "RFID tag," and "processor"—relate

to one or more of these five patents-in-suit:  the '198, '251, '240, '468, and '835 Patents.

    The '198 Patent:  These asserted claims require a "processing block" configured to

perform numerous, specific operations.  Impinj does not even attempt to address all of those

requirements.  Its absence of proof necessarily renders its infringement case deficient and

compels summary judgment of non-infringement.

    The '251, '240, and '468 Patents and Claim 41 of the '835 Patent:  These asserted claims

require an RFID transponder or tag, each of which requires an antenna.  But NXP does not attach

any antennas to the products that it makes and sells, and therefore there cannot be direct

infringement.  For the '251, '240, and '835 Patents, that compels non-infringement as to any

theory (direct or indirect), because Impinj pursues only direct infringement for those patents.  For

the '468 Patent, summary judgment of no direct infringement should be granted.

    Claims 1, 52, and 61 of the '835 Patent:  There can be no infringement of these remaining

asserted claims of the '835 Patent because the accused products do not have a "processor."

Summary judgment of non-infringement of these five patents should be granted.

## BACKGROUND

The material, undisputed facts relevant to this motion are discussed within the Argument.

## ARGUMENT

**A.    There Cannot be Infringement of the '198 Patent Because the Accused Products Do Not Meet the Claimed "Processing Block"**

Summary judgment of non-infringement is warranted for all asserted claims of the '198

Patent (claims 8, 10, 13, 15, 17, and 20), because Impinj cannot show that the accused products

contain a "processing block . . . configured to" perform specific functions.  Claim 8 (and its

dependent claims 10 and 13) requires that the processing block be configured to:

> [a] retrieve the first identifier and the check code;
> *[b] determine that the check code does not correspond to the first identifier and that the first identifier is therefore corrupted;*
> [c] write a corruption code to the memory indicating that the first identifier is corrupted; and
> [d] respond to an identifier-requesting command by *transmitting a reply to the command including the corrupted first identifier.*

Ex. 57 ('198 Patent (lettering and emphasis added)).  Claim 15 (and its dependent claims 17 and

20) similarly requires that the processing block be configured to:

> [a] retrieve the first identifier and the check code;
> *[b] determine that the check code does not correspond to the first identifier and that the first identifier is therefore a corrupted identifier;*
> *[c] attempt to reconstruct a correct identifier from at least the corrupted identifier and the check code if the reconstruction attempt succeeds;*
> [d] write an error code to the memory; and
> [e] respond to an identifier-requesting command with the correct identifier if the reconstruction attempt fails: write a corruption code to the memory; and *respond to the identifier-requesting command with the corrupted first identifier.*

Ex. 57 ('198 Patent (lettering and emphasis added)).

Impinj did not even try to identify in the accused products, much less associate with the

accused processing block, the functions emphasized above.  Impinj's absence of proof compels summary judgment of non-infringement.

>    1.    **Impinj Offers No Evidence That the Accused Products "Determine that the Check Code Does Not Correspond to the First Identifier and that the First Identifier is Therefore Corrupted [or a Corrupted Identifier]"**

Claims 8 and 15 both recite a processing block configured to "determine that the check code does ***not correspond to*** the first identifier and that the first identifier" is "therefore corrupted" (claim 8) or "a corrupted identifier" (claim 15).  Ex. 57 ('198 Patent).  Impinj accuses the "CRC-16" as the "check code."  *See* Ex. 41(Franzon Opening Rpt.), ¶¶ 330, 400.[10]  But Impinj offers no evidence whatsoever that the CRC-16 is compared to the first identifier to determine whether it corresponds to the first identifier and therefore determine that the first identifier is corrupted.  *See* Ex. 47 (Engels Rebuttal Rpt.), ¶¶ 463-465, 534, 535, 586.

For UCODE 8/8m, Impinj offers a single sentence from the UCODE 8/8m Datasheet as purported evidence that the CRC-16 is compared to the first identifier.  *See* Ex. 41(Franzon Opening Rpt.), ¶¶ 350, 417.  Dr. Franzon states that the "implemented ***CRC*** is applied on the EPC and User-Memory," which contains the first identifier.  *Id*.  This is unsupported, and no reasonable jury could credit it, because Dr. Franzon ***misquotes*** the Datasheet.  The Datasheet actually states that the comparison is something different:  "[t]he implemented ***ECC*** is applied on the EPC- and User-Memory."  Ex. 40 at 1953.  And Dr. Franzon does not accuse an ECC as the check code in the UCODE 8/8m products.

For UCODE 9, Dr. Franzon likewise identifies no function of comparing the alleged "check code" (the accused CRC-16) and first identifier, relying only on the mere fact that error

---

[10] Dr. Franzon incorporates by reference his analysis of element 1(d), which contains substantially the same limitation.

correction occurs.  Ex. 41 (Franzon Opening Rpt.), ¶ 418.  To be sure, in discussing UCODE 9,

Dr. Franzon identifies an "ECC 5-bit check code," but he does not rely on that for the claimed

function of comparing the check code to the first identifier.  As he states:  "I have not seen

evidence that this 5-bit check code is actually utilized as part of the error correction of the

UCODE 9."  *Id.*, ¶¶ 400, 418.  Impinj's absence of any theory, let alone proof, of this claimed

function warrants summary judgment of non-infringement.

> ### 2.  Impinj Offers No Evidence That the Accused Products "Attempt to Reconstruct a Correct Identifier" from the Corrupted Identifier and Check Code

Claim 15 recites a processing block configured to "attempt to reconstruct a correct

identifier from at least the corrupted identifier and the check code."  Ex. 57 ('198 Patent).  But

Dr. Franzon does not analyze whether, in the accused products, the alleged corrected identifier is

reconstructed from the corrupted identifier or from the check code (again, the accused CRC-16).

Ex. 41 (Franzon Opening Rpt.), ¶¶ 364, 365, 467.  He simply does not address how

reconstruction is performed by UCODE 8/8m, much less whether it utilizes the corrupted

identifier and CRC-16.  *Id.*, ¶ 467.  Although he states that the accused UCODE 8/8m is capable

of detecting multi-bit errors and correcting at least one-bit errors, *id.*, ¶¶ 364, 467, that is

irrelevant—that function is not claimed.

Here again, Impinj's absence of any theory, let alone proof, of this claimed function

warrants summary judgment of non-infringement.

> ### 3.  Impinj Offers No Evidence That the Accused Products Transmit a Reply to an Identifier-Requesting Command

Claims 8 and 15 recite a processing block configured to "respond to an identifier-

requesting command," either "by transmitting a reply to the command including the corrupted

first identifier" (claim 8), or "with the corrupted first identifier" (claim 15).  Ex. 57 ('198 Patent).

Yet again, Dr. Franzon does not provide any analysis of how, or if, the accused processing block is configured to perform these functions.  Ex. 47 (Engels Rebuttal Rpt.), ¶¶ 558-562, 596-598. He opines only that "[t]he NXP documents tout that error correction occurs 'automatically' which would allow [NXP's products] to provide the corrected identifier in response to an interrogation," and that NXP's products "will attempt an error correction in response to an interrogation command and, if the error cannot be corrected, will reply with the corrupted identifier."  Ex. 41 (Franzon Opening Rpt.), ¶¶ 369, 435, 472.  Even assuming *arguendo* that the accused products' "interrogation command" is the identifier-requesting command (which Dr. Franzon never identifies in his report), Dr. Franzon provides no evidence as to how the processing block is configured to process such command, nor reply to it.  He alleges only that the UCODE 8/8m and 9 as a whole can to transmit a corrected identifier to a reader.  Again, this is not claimed, and fails to identify any configuration in the accused processing block, which does not include a modulator or antenna, that would allow the processing block to transmit a reply containing the corrupted or corrected identifier, or any reply at all.

Yet again, Impinj's absence of any theory, let alone proof, warrants summary judgment of non-infringement.

### B.    There Cannot be Infringement of the '251, '240, '468, or '835 Patents Because the Accused Products Do Not Contain a "Transponder" or "RFID Tag"

Summary judgment of non-infringement of all asserted claims of the '251, '240, '468, and '835 Patents is warranted because Impinj cannot show that the accused products contain an RFID "transponder" or an "RFID tag," as required by these asserted claims.[11]

_____

[11] Impinj has only direct-infringement theories for the '251, '240, and '835 Patents. Impinj's Final Infringement Contentions do not disclose indirect infringement for either of the '251 or '835 Patents (*see* Ex. 45 (Impinj's Final Infringement Contentions dated March 29, 2022); Ex. 46 (Impinj's Final Infringement Contentions dated March 29, 2022, '251 Patent Chart); Ex. 53 (Impinj's Final Infringement Contentions dated March 29, 2022, '835 Patent

### 1.    There Cannot be Infringement of the '251 and '240 Patents Because the Accused Products Do Not Contain a "Transponder"

The asserted claims of the '251 and '240 Patents (claims 8, 10, and 14 of the '251 Patent and claims 1, 2, and 8 of the '240 Patent) require a "transponder" in the preamble. Ex. 58 ('251 Patent); Ex. 52 ('240 Patent). Impinj agrees that the '240 Patent preamble is limiting. This limitation is dispositive for these claims: There cannot be infringement because, under its plain and ordinary meaning as Impinj's own expert opines, "transponder" requires the ability to receive and respond to RF signals: "Receiving and responding to signals is the basic functionality of a transponder" and "[a]ny other understanding of transponder would not be within the plain and ordinary meaning." Ex. 20, ¶¶ 206, 163 ("transmitting and responding to signals"). And it is undisputed that the accused products, which are ICs lacking an antenna, cannot receive or respond to RF signals without such antenna.

Each preamble recites: "A Radio-Frequency Identification (RFID) transponder including." As Dr. Sechen opines in the context of the '240 Patent, the preamble is limiting:

> It is my understanding that the Examiner's response implies an RFID transponder is **essential to the claims**. I agree that this is a correct interpretation of the claim language and **the preamble should limit the claims** as an essential part of the claim language.

Ex. 29, ¶ 59. Under well-established precedent on preambles, that is correct.

"In general, a preamble limits the invention if it recites essential structure or steps, or if it

---

Chart)); and therefore any indirect-infringement theory for that Patent is forfeited. *See Appliance Computing III, Inc. v. Redfin Corp.*, No. 6:20-CV-00376-ADA, 2022 WL 2101693 (W.D. Tex. May 2, 2022) (precluding plaintiff "from presenting any theory of contributory infringement at trial having failed to disclose any contributory infringement theory in its Final Infringement Contentions, or otherwise"). For the '240 Patent, Impinj's experts did not opine on indirect infringement, and thus any indirect-infringement theory for the '240 Patent is likewise forfeited. For the '734 and '198 Patents discussed in Motion #3 and in Argument A of this Motion #4, NXP's arguments apply equally to direct and indirect infringement.

is necessary to give life, meaning, and vitality to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002).  To be non-limiting, the preamble must merely be where the patentee "defines a structurally complete invention in the claim body" and only "state[s] a purpose or intended use for the invention."  *Id*.  Relevant "guideposts" include whether the preamble "provides antecedent basis," "is essential to understand limitations or terms in the claim body," and "recites 'additional structure or steps underscored as important by the specification,'" and whether there is "'clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art.'"  *Parkervision, Inc. v. LG Elecs., Inc.*, No. 6:21-CV-00520-ADA, 2022 WL 2240465, at *6 (W.D. Tex. June 21, 2022) (citing *Catalina*, 289 F.3d at 808).  This standard is easily met here.  The shared specification of the '251 and '240 Patents makes clear that the preamble is limiting.

The "Abstract" highlights the transponder:  "A Radio-Frequency Identification (RFID) transponder is provided."  Ex. 58 ('251 Patent) at Abstract; Ex. 52 ('240 Patent) at Abstract. Likewise, the "Field of The Invention" is identified as the "field of Radio Frequency Identification (RFID) transponders (e.g., RFID tags)."  Ex. 58 ('251 Patent) at 1:17-19; Ex. 52 ('240 Patent) at 1:23-25.  The "Background of the Invention" describes "transponders" that receive "signal bursts sent by a reader (or interrogator)" by means of "a tag antenna on each of the transponders" and that "broadcast a return signal."  Ex. 58 ('251 Patent) at 1:30-39; Ex. 52 ('240 Patent) at 1:35-45.  The specification also equates an RFID transponder with an "RFID tag," which also undisputedly includes an antenna.  Ex. 58 ('251 Patent) at 1:18-19; Ex. 52 ('240 Patent) at 1:24-25 ("transponders (e.g., RFID tags)"); Ex. 58 ('251 Patent) at 1:40-41; Ex. 52 ('240 Patent) at 1:46-47 ("operation of an array of ten RFID tags").  Moreover, claim 10 of the '251 Patent recites "***the*** RFID transponder," which relies on the preamble of claim 8 for its

42

antecedent basis. *In re Fought*, 941 F.3d 1175, 1178 (Fed. Cir. 2019) (holding that "a preamble [is] limiting when it serves as antecedent basis for a term appearing in the body of a claim").

These disclosures confirm that the RFID transponder in the preamble "does not state a purpose or an intended use of the invention, but rather discloses a fundamental characteristic of the claimed invention that is properly construed as a limitation of the claim itself." *Poly-Am., L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004).

It is undisputed that the accused products are ICs for an RFID tag, and are not themselves a tag. It is further undisputed that the accused products do not have an antenna and that, without an antenna, the products cannot receive and respond to signals. Dr. Sechen distinguished RFID tag and its component RFID IC, explaining that "an RFID tag ***will contain at least an antenna*** for receiving and transmitting signals and an IC with circuitry for processing signals, storing information, and performing additional functionality." Ex. 20, ¶ 74. Sechen opined: "For the IC in an RFID tag to perform its functionality, ***it must at least be connected to an antenna for sending and receiving signals***." *Id.*, ¶ 77. Dr. Sechen also verified that, to send an RF signal, in the case of an RFID transponder, the IC requires "some means, be it a coil or antenna or something to send it over the airways. And so you would typically have associated with [the] transponder IC also an antenna." Ex. 42 (Apr. 6, 2023 Sechen Dep. Tr.) at 53:8-16. Dr. Sechen equated "RFID transponder" with "RFID tag"—"I think they're normally taken to be the same." *Id.* at 87:25-88:2. Impinj's witness Mr. Oliver confirmed that the term "RFID transponder" evolved into the term "RFID tag." Ex. 43 (Oliver Dep. Tr.) at 20:25-21:13.

Impinj's John Hyde, the sole inventor of the '251 and '240 Patents, confirmed that RFID ICs need an antenna to receive an RF signal:

> Well, the . . . Impinj competitors . . . make RFID chips, silicon
> chips that . . . we all sell, but the chip by itself is not useful to end
> customers because it needs an antenna to receive the RF signal.

Ex. 38 (Hyde Dep. Tr.) at 71:10-25.  Impinj's founder and CEO, Dr. Diorio testified that an

RFID IC cannot send radio waves without an antenna:

> If it doesn't have an antenna, it's not going to do very much.  So
> you attach the integrated circuit to an antenna to allow the
> integrated circuit to send radio waves over the air.  Absent the
> antenna, the integrated circuit does not have an ability to send
> radio waves over the air nominally by itself.

Ex. 44 (Apr. 13, 2022 Diorio Dep. Tr.) at 27:16-22 (excepting ICs with small integrated

antennas, which the accused products do not have); *see also id.* 160:9-10 ("That IC on the

antenna is then capable of receiving radio waves over the air.").

In nonetheless asserting infringement including based on the "transponder" limitation,

Dr. Sechen alleges that the accused products are transponders because they include an "RFID IC

for RFID tags" and "because they are a wireless communication device that receive and respond

to signals."  Ex. 20, ¶¶ 164, 166, 206.  But that can only be directed to the products later

downstream, after an antenna is added, which is nothing that NXP does.  Dr. Sechen agrees that

that the accused products, as sold by NXP, cannot receive or transmit/respond to signals.  The

accused products thus cannot meet the undisputed and plain and ordinary meaning of

"transponder."  "[C]onclusory expert declarations devoid of facts upon which the conclusions

were reached fail to raise a genuine issue of material fact which would preclude summary

judgment."  *Zelinski v. Brunswick Corp.,* 185 F.3d 1311, 1317 (Fed. Cir. 1999) (citing *Phillips

Petroleum Co. v. Huntsman Polymers Corp.,* 157 F.3d 866, 876 (Fed. Cir. 1998)).

At his deposition, Dr. Sechen asserted that an RFID IC, such as the accused products, has

no substantial use "outside being used in a tag or transponder."  Ex. 42 at 55:20-56:9; *see also*

Ex. 42 at 87:18-24; 45:15-20 (the IC "has no significant use outside of transponder including an

antenna."). But this is not the test for direct infringement, which is Impinj's only theory of infringement for the '251 and '240 Patents. *See supra* note 12. For direct infringement, "***every*** limitation set forth in a claim must be found in an accused product, ***exactly***." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995). Rather, it is the test for contributory infringement—which Impinj does not allege with respect to these patents. *See* 35 U.S.C. § 271(c) ("Whoever offers to sell or sells within the United States or imports into the United States a ***component*** of a patented machine…constituting a material part of the invention…shall be liable as a ***contributory*** infringer.").

It is undisputed that the accused products are RFID ICs, which ***do not*** contain antennas and cannot receive or respond to signals without antennas. *See* Ex. 20, ¶¶ 207, 210, 212 (same for UCODE 9); *see also* Ex. 39 (UCODE 7 Datasheet) at -1894 ("NXP's UCODE 7 IC is the leading-edge EPC Gen2 RFID chip."); Ex. 40 (UCODE 8/8m Datasheet) at -1934 ("The UCODE 8 and UCODE 8m iCs are the latest NXP products of the UCODE family."). Dr. Sechen does not offer contradictory evidence. He does not offer any evidence that the accused devices receive or respond to signals without antennas, because they do not. In view of this, no reasonable jury could conclude that any of the accused products, which cannot receive or respond to signals without an antenna, is or contains a transponder.

Accordingly, summary judgment of no direct or indirect infringement is warranted for the asserted claims of the '251 and '240 Patents. As a matter of law, Impinj cannot show direct infringement, and it has forfeited any theories of indirect infringement for these patents.

### 2. There Cannot be Infringement of the '468 Patent Because the Accused Products Do Not Contain an "RFID Tag"

For similar reasons, Impinj cannot prove no infringement of claim 1 of the '468 Patent, its only asserted claim. The preamble of claim 1 recites "a radio-frequency identification (RFID)

tag." The term "RFID tag" has its plain and ordinary meaning. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) ("We have frequently stated that the words of a claim words of a claim are generally given their ordinary and customary meaning.") (internal quotation marks omitted). And as noted, it is undisputed that an RFID tag and an RFID transponder are synonymous. Indeed, the '468 Patent expressly equates the terms: "***Radio-frequency identification tags (or transponders)*** require a reference frequency for a number of purposes." Ex. 49 ('468 Patent) at 1:17-18. The plain and ordinary meaning of RFID tag is thus that it must be able to receive and transmit/respond to RF signals.

But as discussed above, it is undisputed that the accused products are ICs that lack an antenna, and thus cannot receive or respond to RF signals without such antenna. Again, the only issue here is whether the preamble is limiting. And again, it is.

*First*, the '468 Patent preamble provides an antecedent basis for terms recited in the claim body. The preamble recites "***a*** radio-frequency identification (RFID) tag," which serves as the antecedent basis to "***the*** RFID tag" recited in subsequent limitations in claim 1. *See* Ex. 49 ('468 Patent). Where a preamble serves as an antecedent basis for subsequent terms in the body of the claim, that strongly favors treating the preamble as limiting. *See In re Fought*, 941 F.3d at 1178 ("We have repeatedly held a preamble limiting when it serves as antecedent basis for a term appearing in the body of a claim."); *Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1371 (Fed. Cir. 2020) ("The fact that the [preamble terms] provide antecedent basis for these terms in the body of the claim is a strong indication that the preamble acts 'as a necessary component of the claimed invention.'" (citation omitted); *accord Parkervision*, 2022 WL 2240465, at *6.

*Second*, the preamble is essential to understand the limitations of the claim body. The

46

preamble describes the recited location and origin of signals.  The claim body recites generating

an oscillation frequency signal and a command signal in a specific location, "***within the RFID***

***tag***,"  Ex. 49 ('468 Patent).  This is opposed to generating the signals in another location, such as

within the RFID reader that is recited in claim 1.  *Id.*  Similarly, claim 1 requires the recited

command signal to be based on command data **"*received at the RFID tag*."**  *Id.*  And Dr. Sechen

distinguishes prior art based on the requirements that recited structure be located within the

RFID tag:  "[T]he only 'controller' described by Petersen is in a reader, not a tag."  Ex. 29

(Sechen Reb. Rep.), ¶ 268; *see also id.* at ¶ 270 (further distinguishing Petersen as not disclosing

components within a tag), ¶ 302 (distinguishing prior art for failure to disclose a tag controller).

    *Third*, the preamble recites structure (RFID tag), which the specification underscores is

important.  *Catalina*, 289 F.3d at 808 ("a preamble limits the invention if it recites essential

structure or steps").  Similar to the '251 and '240 Patents, the specification of the '468 Patent

makes clear that an RFID tag is central to the claimed invention.  The Patent's title highlights

that the patent is directed to an RFID tag that backscatters (i.e., transmits) an RF signal:

"Method and System To Backscatter Modulate A Radio-Frequency Signal From An RFID Tag

In Accordance With Both An Oscillation Frequency Signal And A Command Signal."  Ex. 49

('468 Patent) at Title.  The "Abstract" introduces the invention as a method "to backscatter

modulate a first RF signal from an [RFID] tag" (Ex. 49 ('468 Patent) at Abstract), emphasizing

the importance not only of the RFID tag, but specifically its role in sending a signal, i.e., to

backscatter an RF signal from that RFID tag.  The very first words of the "Background of the

Invention" section are:  "Radio-frequency identification tag."  Ex. 49 ('468 Patent) at 1:17.  And

throughout its description of its claimed invention, the specification consistently discusses an

RFID tag.  *See* Ex. 49 ('468 Patent) at 1:17; *id.* at Figs. 9-12, 16-24 and accompanying text

(illustrating and describing RFID tags); *see also id.* at 3:49-4:19 (describing Figures 9-12 and 16-24 as "embodiment(s) of the present invention").

In short, the preamble is limiting.  Because the accused products are not, and do not contain, an RFID tag, summary judgment of no direct infringement should be granted.

### 3. There Cannot be Infringement of Claim 41 of the '835 Patent Because the Accused Products Cannot Receive or Backscatter Waveforms

The lack of an antenna in NXP's accused products likewise precludes infringement of the claim 41 of the '835 Patent as a matter of law.

Claim 41 is a method claim that requires, based on its dependency from claim 36, "receiving waveforms from an RFID reader . . .  and backscattering a tag waveform that includes symbols…."  Ex. 48 ('835 Patent).  As discussed in Arguments B.1-B.2 of this Motion #4 above, it is undisputed that NXP's products cannot receive or transmit signals because they lack an antenna, and it is further undisputed that the accused products do not contain, nor are, RFID tags that receive waveforms from a reader or backscatter a waveform.  Accordingly, the accused products cannot receive waveforms from an RFID reader or backscatter (i.e., return or transmit) a waveform in response.  *See* Ex. 20 (Sechen Opening Report), ¶ 565 ("The UCODE 7, 8, and 9 are RFID ICs and must be joined with an antenna on the RFID tag to received waveforms from an RFID reader.").  Impinj has no evidence to the contrary.  *See* Ex. 32 at 253:5-7 ("Q. The tag's communication to the reader is called backscatter? A. Yes.").

Accordingly, summary judgment of no infringement—direct or indirect—is warranted for claim 41 of the '835 Patent.  *See supra* note 12.  As a matter of law, Impinj cannot show direct infringement, and it has forfeited any theories of indirect infringement for these patents.

### C. There Cannot be Infringement of Claims 1, 52, and 61 of the '835 Patent Because the Accused Products Do Not Contain a "Processor"

Summary judgment of non-infringement for the remaining asserted claims of the '835

Patent (claim 1, 52, and 61) is also warranted: The accused products do not include "a processor," as required by these claims.

As this Court has recognized, it is well-established that, according to its plain and ordinary meaning, a "processor" executes software: "[T]he term 'processor' is the component of a computer that executes software." *WSOU Invs. LLC v. Oneplus Tech. (Shenzhen) Co.*, No. W-20-CV-00952-ADA, 2022 WL 3500120, at *13 (W.D. Tex. May 24, 2022); *Clear Imaging Research, LLC v. Samsung Elecs. Co.*, No. 2:19-cv-00326-JRG, 2020 WL 6384731, at *8 (E.D. Tex. Oct. 30, 2020) ("'processor'' is accorded its customary meaning of a class of structures on which software can run") (citing the IEEE definition of "[a] system or mechanism that accepts a program as input, prepares it for execution, and executes the process so defined with data to produce results"); *see also, e.g.*, *Nomadix, Inc. v. Hospitality Core Servs. LLC*, No. CV 14-08256 DDP (VBKx), 2016 WL 344461, at *4 (C.D. Cal. Jan. 27, 2016) ("there is no reason for a formal claim construction of the term 'processor' because it is a well-known term in the relevant art").

For alleged infringement, however, Impinj lacks any evidence that the accused products contain a "processor." Dr. Sechen points to an irrelevant feature—that the accused product has a "form of digital control." Ex. 20 (Sechen Opening Rpt.), ¶¶ 513, 519, 525. According to Dr. Sechen, "[t]he digital section includes the state machines, processes the protocol, and handles communication with the EEPROM, which contains the EPC and the user data." *Id.* As NXP's expert explains, however, applying the plain meaning that a processor must be "capable of running software," "[t]he digital control block is not a processor nor does it include a processor." Ex. 47 (Engels Rebuttal Rpt.), ¶¶ 68, 219. As he explains, "if a processor was in any of these products, it would be described in a product datasheet"—and it is not. *Id.*, ¶ 220.

██████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

Impinj has never argued that the term "processor" does not carry its plain and ordinary meaning in the '835 Patent, nor could it.  The term "processor" is not a term that is "too complex for a jury to understand," and there is no evidence to suggest that Impinj "act[ed] as a lexicographer or explicitly disavow[ed] the full scope of the claim" for the "processor" limitation.  *Swissdigital USA Co. v. Wenger S.A.*, No. 6:21-cv-00453-ADA-DTG, 2022 WL 3567348, at *3 (W.D. Tex. Aug. 18, 2022).  Nor is there any basis to submit this issue to the jury.  The purported disagreement between Impinj's expert and NXP's expert is not a question of fact for the jury.  Rather, it is an absence of any proof that the accused products contain a "processor."  Where, as here, "the patentee's proof is deficient in meeting an essential part of the legal standard for infringement," summary judgment of non-infringement is warranted.  *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1577 (Fed. Cir. 1989).  No reasonable jury could find that the digital control block, which does not execute software, satisfies the "processor" limitation.

## CONCLUSION

NXP's motion for summary judgment should be granted in its entirety.

Dated: June 2, 2023                         Respectfully submitted,


                                            */s/ Michael Hendershot*
                                            Michael Hendershot
                                            Tharan Gregory Lanier
                                            Gurneet Singh
                                            JONES DAY
                                            1755 Embarcadero Road
                                            Palo Alto, CA 94303
                                            (650) 739-3939
                                            mhendershot@jonesday.com

50

tglanier@jonesday.com
gsingh@jonesday.com

J. Mark Mann
State Bar No. 12926150
mark@themannfirm.com
G. Blake Thompson
State Bar No. 24042033
blake@themannfirm.com
MANN | TINDEL | THOMPSON
112 E. Line Street, Suite 304
Tyler, Texas 75702
(903) 657-8540

Thomas W. Ritchie
Lisa Furby
Timothy J. Heverin
JONES DAY
110 North Wacker Dr., Suite 4800
Chicago, IL 60606
(312) 782-3939
twritchie@jonesday.com
lfurby@jonesday.com
tjheverin@jonesday.com

T. Kaitlin Crowder
Robert M. Breetz
JONES DAY
901 Lakeside Ave.
Cleveland, OH 44114
(216) 586-3939
kcrowder@jonesday.com
rbreetz@jonesday.com

Jonathan McNeal Smith
John R. O'Donnell
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071
(213) 489-3939
jonathansmith@jonesday.com
jodonnell@jonesday.com

Tracy A. Stitt
Yury Kalish

Robert Levent Herguner
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001-2113
(202) 879-3939
tastitt@jonesday.com
ykalish@jonesday.com
rlherguner@jonesday.com

Stephanie M. Mishaga
JONES DAY
4655 Executive Dr., Suite 1500
San Diego, CA 92121-3134
(858) 314-1200
smishaga@jonesday.com

*Counsel for Defendant/Counterclaim Plaintiff,
NXP USA, INC.*

*Counsel for Defendant,
NXP SEMICONDUCTORS NETHERLANDS,
B.V.*

## <u>CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL</u>

The undersigned certifies that the foregoing document and all supporting documents are being filed under seal pursuant to the Court's Local Rule.

*/s/ G. Blake Thompson*
G. Blake Thompson

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on June 2, 2023, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via electronic mail.

Dated: June 2, 2023

*/s/ G. Blake Thompson*
G. Blake Thompson